797 So.2d 1134 (1999)
Clarence Leland SIMMONS
v.
STATE.
CR-97-0768.
Court of Criminal Appeals of Alabama.
September 17, 1999.
Opinion on Return to Remand April 28, 2000.
Opinion on Return to Second Remand June 30, 2000.
Rehearing Denied September 25, 2000.
*1143 J.T. Simonetti, Jr., Birmingham, for appellant.
Bill Pryor, atty. gen., and A. Vernon Barnett IV, asst. atty. gen., for appellee.
FRY, Judge.[1]
On August 2, 1996, a Jefferson County grand jury returned an indictment charging the appellant, Clarence Leland Simmons, with three counts of capital murder. Count I of the indictment charged Simmons with the capital offense of murder committed during the course of a burglary, § 13A-5-40(a)(4), Ala.Code 1975. Count II of the indictment charged Simmons with the capital offense of murder committed during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975. Count III of the indictment charged Simmons with the capital offense of murder committed during the course of a sexual abuse, § 13A-5-40(a)(8), Ala.Code 1975. Simmons was tried on the charges. At the close of the State's case, the trial court dismissed, at the State's request, Count I of the indictment. The jury returned verdicts finding Simmons guilty of intentional murder, a lesser included offense of the capital murder charge in Count II of the indictment, and guilty of capital murder as charged in Count III of the indictment. The trial court entered judgments of convictions of both verdicts.
The jury, with regard to Simmons's conviction for capital murder under Count III of the indictment, by a vote of 11 to 1, recommended that Simmons be sentenced to death. The trial court, following the jury's recommendation, sentenced Simmons to death by electrocution. The record *1144 does not contain a sentence imposed by the trial court with regard to Simmons's conviction for the lesser included offense of intentional murder under Count II of the indictment. Because we must remand this cause for a hearing on the admissibility of the deoxyribonucleic acid (DNA) population frequency statistical analysis evidence, an extensive statement of the facts of this case is not necessary at this time.
Simmons contends that the trial court erred by admitting into evidence testimony concerning the results of DNA testing because, he says, the State failed to establish that the polymerase chain reaction (PCR) method of DNA-typing evidence and that the DNA population frequency statistical analysis evidence was reliable, as required by Ex parte Perry, 586 So.2d 242 (Ala. 1991). He further argues that the testimony of the State's expert witness failed to satisfy the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as to key questions concerning the evaluation of techniques and methodologies underlying the expert's conclusions. Simmons did not challenge the admissibility of the DNA evidence at trial; therefore, we conduct our review for plain error. Rule 45A, Ala.R.App.P.
Evidence was presented at trial that the DNA in a bloodstain found on clothing found located in Simmons's apartment "matched" seven characteristics of the DNA in the blood of the victim. According to testimony, the probability of finding similar DNA was 1 in 800,000 individuals in the Caucasian race and 1 in 9,000,000 individuals in the black race.
Initially, we note that § 36-18-30, Ala. Code 1975not Perryprovided the standard by which the courts of Alabama determined the admissibility of DNA evidence at the time of Simmons's trial. Section 36-18-30 states:
"Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et ux., et al. v. Merrell Dow Pharmaceuticals, Inc., decided on June 28, 1993."
Guidance as to the interpretation § 36-18-30 was provided by the Alabama Supreme Court in Turner v. State, 746 So.2d 355 (Ala.1998). Although Simmons was tried before the Supreme Court released its opinion in Turner, we find the Supreme Court's interpretation of § 36-18-30, Ala. Code 1975, and its requirements in that case pertinent.
In Turner, the Alabama Supreme Court held:
"[I]f the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36-18-30, determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
"I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based `reliable'?
"II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based `relevant' to understanding the evidence or to determining a fact in issue?
"Trial courts should use the flexible Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, *1145 125 L.Ed.2d 469 (1993)], analysis in making the `reliability' (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.
"Trial courts should make the `relevance' assessment by addressing the `fit' between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.
"Of course, once a particular theory or technique has satisfied § 36-18-30, a court may take judicial notice of that theory or technique's reliability. See Perry, 586 So.2d at 251; [United States v.] Beasley, 102 F.3d [1440] at 1448 [(8th Cir.1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997)] (holding that reliability of the polymerase chain reaction (`PCR') method of DNA typing would be subject to judicial notice in future cases); [United States v.] Martinez, 3 F.3d [1191] at 1197 [(8th Cir.1993), cert. denied, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994)] (holding that the reliability of the restriction fragment length polymorphism (`RFLP') procedure was subject to judicial notice). We recognize that the state of scientific theories and the techniques for producing DNA evidence is not static, and that the scientific community undoubtedly will produce new theories and techniques regarding DNA. Each new theory and technique will be subject to the test set out above until its reliability warrants judicial notice."
746 So.2d at 362 (footnotes omitted).
In the present case, because the admission of the DNA evidence was not contested or challenged before or during trial, the trial court did not hold a hearing outside the presence of the jury. In Payne v. State, 683 So.2d 440, 455 (Ala.Cr. App.1995), aff'd, 683 So.2d 458 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997), we held that a trial court did not commit reversible error by not holding a hearing outside the presence of the jury to determine the admissibility of the DNA evidence. In Payne, we concluded that if a defendant wanted to allege that the trial court erred in not conducting a hearing outside the jury's presence to determine the admissibility of the DNA evidence, it was incumbent upon the defendant to have first requested that such a hearing be conducted. Accordingly, because Simmons did not request a hearing, no reversible error occurred in this regard in the trial court's admission of the DNA evidence.
At trial, the state offered PCR-matching DNA evidence and DNA population frequency statistical analysis evidence to establish Simmons's presence during and his participation in, the offense. The record reflects that Larry Huys, a forensic serologist for the Birmingham laboratory of the Alabama Department of Forensic Sciences, testified that he performed the PCR analysis on blood samples from the victim and from Simmons. According to Huys, the PCR technique is used by the Alabama Department of Forensic Sciences to determine whether two DNA samples match. He testified that the theory and *1146 technique of the PCR method used by the Alabama Department of Forensic Sciences's Birmingham laboratory are generally accepted and considered reliable by the Federal Bureau of Investigation and the scientific community; he further testified that the theory and technique have been extensively "written about" in scientific journals and subjected to peer review. He further elaborated on the controls built into the testing process to further ensure the test's reliability; he testified that his test results in this case indicated no error or contamination. Based on Huys's testimony, the State established the reliability of the theory and technique of the PCR method of DNA analysis so as to satisfy § 36-18-30, Ala.Code 1975. See United States v. Beasley, 102 F.3d 1440 (8th Cir. 1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997)(listing several cases recognizing the PCR method as valid and scientifically reliable).
This court has acknowledged the reliability of the theory and techniques used in the PCR method of DNA analysis. Maples v. State, 758 So.2d 1 (Ala.Cr.App. 1999). Therefore, as the Alabama Supreme Court took judicial notice of the reliability of the theory and techniques used in RFLP DNA matching testing in Turner, we take judicial notice of the reliability of the theory and techniques used in the PCR method of DNA analysis.
Additionally, the State established that the DNA evidence was relevant to determine a fact in issue, i.e., whether Simmons was present in the victim's apartment and participated in the offense. Huys testified that he analyzed blood samples from Simmons and the victim and bloodstains found on Simmons's clothes and that he compared his results to the results of tests conducted on blood found at the crime scene. Therefore, Huys's testimony established the relevance prong of admissibility.
Because the record adequately establishes that the PCR method of DNA analysis is reliable and that the evidence provided by the analysis was relevant, the trial court committed no errorplain or otherwise in admitting the evidence.
However, with regard to the admissibility of the DNA population frequency statistical analysis evidence, as was the case in Turner, we are likewise unable to determine whether the State satisfied the reliability test as to the theory and technique used by the Department of Forensic Sciences. We are uncertain whether the trial court took judicial notice of the reliability of the state's DNA population frequency statistical analysis evidence. If the trial court did take judicial notice, the record is unclear as to the basis for doing so. Consequently, we cannot determine whether the trial court committed reversible error in this regard.
The admission of the DNA evidence and its impact on Simmons's trial is pivotal. Therefore, we remand this cause to the trial court so that that court can conduct an evidentiary hearing to determine the admissibility of the DNA population frequency statistical analysis evidence. If the trial court determines that the evidence was admissible, it should enter a written order so stating. If the trial court determines that the evidence was inadmissible, it should order a new trial. Notwithstanding, the trial court should place in the record specific findings regarding the reliability and the relevance of the DNA population frequency statistical analysis evidence. A return to remand shall be filed with this court within 42 days of the date of this opinion. The return to remand shall include a transcript of the remand proceedings conducted by the trial court *1147 and any evidence submitted, as well as the trial court's findings of fact.
REMANDED WITH DIRECTIONS.
LONG, P.J., and McMILLAN and COBB, JJ., concur.
BASCHAB, J., dissents without opinion.

On Return to Remand
FRY, Judge.
On September 17, 1999, we remanded this cause to the trial court to conduct a hearing on the admissibility of the deoxyribonucleic acid ("DNA") population frequency statistical analysis evidence. Simmons v. State, 797 So.2d 1134 (Ala.Cr.App. 1999). The circuit court has complied with our order, determined that the evidence was admissible, and submitted a written order. The trial court's findings are supported by the record and will be discussed in Part I of this opinion. We deferred addressing the other issues Simmons raised on appeal, pending compliance with our directions on remand. Because the trial court has complied with our directions on remand, we will now address those other issues.
Simmons was indicted for three counts of capital murder. Count I charged the capital offense of murder during the course of a burglary (§ 13A-5-40(a)(4), Ala.Code 1975); Count II charged the capital offense of murder during the course of a robbery (§ 13A-5-40(a)(2)); and Count III charged the capital offense of murder during the course of sexual abuse (§ 135-40(a)(8)). The trial court dismissed Count I, and Simmons was found guilty of the lesser-included offense of murder as to Count II and was found guilty of capital murder as charged in Count III.
The evidence presented at trial indicated the following: During the afternoon of January 2, 1996, Simmons met the victim M.A., a 65-year-old, mildly retarded great-grandmother, at the South Place Pool Hall. The testimony indicated that Simmons did not know M.A. before that day. Jack Neely testified that while Simmons and M.A. were at the pool hall, Simmons engaged him in an altercation. During this altercation Simmons pulled out a knife and threatened to "take [Neely] out and cut [Neely] up." (R. 401.) After the bartender stopped the fight, Simmons and M.A. left the pool hall together. Loretta Chambers, who was also present at the pool hall, testified that she witnessed the altercation and that she heard Simmons tell Neely that he had already been declared legally insane and that he could "cut [Neely] up right then and there and get away with it." (R. 420.)
Betty Harper, a resident at Highland Manor apartments where M.A. lived, testified that at about 4:30 p.m. on January 2, 1996, she saw M.A. enter the lobby of Highland Manor and get on the elevator with Simmons. Harper further testified that during the early morning hours of January 3, she heard an alarm go off inside the building. She testified that the alarm indicated that someone had left the building by the back door.
Jerry Trousdale, a Highland Manor maintenance employee, testified that he rode the elevator with M.A. and Simmons on the afternoon of January 2.
Alma Underwood, a security guard at Highland Manor, testified that on January 3, M.A.'s daughter requested that she enter M.A.'s apartment to check on M.A. Underwood found M.A.'s body and telephoned the police.
Birmingham Police Officer Charles Underwood, an evidence technician, testified that he investigated the crime scene. According to Officer Underwood, he found M.A.'s nude body blocking the bathroom door. M.A. had been stabbed and disemboweled. *1148 Officer Underwood testified that although M.A.'s body was covered with blood, there was no blood on the bottom of her feet and no blood was splattered in the bathroom. He further noted that the bathtub was filled with diluted blood and hairs. Additionally, the toilet was overflowing because it was clogged with M.A.'s intestines. Nothing in M.A.'s apartment appeared to be disturbed and only M.A.'s fingerprints were found at the crime scene.
A search was conducted of Simmons's apartment. Law enforcement officers seized a knife and several pieces of clothing. Additionally, law enforcement officers secured a sample of Simmons's blood. Larry Huys, a forensic scientist, testified that the DNA in a piece of human tissue found on a pair of pants seized from Simmons's apartment matched the DNA in M.A.'s blood sample.
Dr. Robert Brissie, Jefferson County's medical examiner, conducted the autopsy on M.A.'s body. According to Dr. Brissie, M.A.'s body had been cut by the offender from the upper part of the abdomen, down the front of the abdomen, down across the pubic bone, with several extensive slicing wounds between the legs, then upward on the back of M.A.'s buttocks, to the back. Additionally, M.A. had been stabbed at least 73 times; these stab wounds were approximately an inch and a half in depth and had marks indicating that the knife used to stab M.A. had a hilt. He testified that six of these incised wounds extended across the front of M.A.'s neck. Many of these wounds had been inflicted before M.A. died and, according to Dr. Brissie, were probably intimidation wounds and not fatal. Twenty-three of these wounds were concentrated in the chest area, at least five of these wounds did not penetrate the chest cavity and Dr. Brissie opined that some of these wounds were inflicted while M.A. was alive.
Dr. Brissie testified that M.A.'s hands had suffered very few injuries, indicating that she had engaged in minimal defensive movement. Dr. Brissie noted slight abrasions and bruising on M.A.'s face, especially around M.A.'s lips, indicating that "finger type manipulation" had been applied to her face. Dr. Brissie specifically noted with regard to an injury on M.A.'s left breast area, "[Y]ou can see a sort of model pattern contusions [in the left breast area]. This area of pattern injury I thought was a manipulation injury that is consistent with finger marks." (R. 661.)
Dr. Brissie testified that further additional concentrated notched and slicing wounds were located in the genitalia and anus areas. Dr. Brissie specifically noted,
"And, if you look at the front of the pubic bone area and the region of the genitalia, you can see that this looks like the skin in this area is sort of malpositioned. And, the reason for this is because there were numerouslow type splicing extending down between the leg area and extending through the area of the vagina, and also extending into the anus, and up into part of the rectum."
(R. 666.) He opined that the "obvious frank contusion in some of these [genitalia] tissues, indicat[ed] that the heart was [beating] at the time this area between the legs [was] sliced across, and you can also see extension of these slices into the area of the vagina." (R. 673.)
Dr. Brissie explained that because of the enormous amount of blood found at the scene, he believed that the majority of the stab wounds had been inflicted while M.A. was alive. He specifically noted that most of M.A.'s internal organs had been removed from her body. Her left lung was separated into two pieces; her spleen and *1149 liver had been cut; most of her large and small intestines were missing.[1]
Dr. Brissie noted that M.A.'s body was smeared in blood, but that the bottom of her feet were clean. He opined that because her feet were not bloody and there was no evidence of blood dripping down the body, M.A. probably had been lying on the ground when she was stabbed, and she was unable to engage in any defensive maneuvering. After acknowledging that M.A. was alive throughout at least part of the assault, Dr. Brissie stated,
"Well, I think all of these wounds would be very very painful. I think the combination of all these stab wounds would be painful. I think cutting a 30 inch hole, you know, it may be about a 20 inch hole extending into the abdomen would be painful. I think that just the slices through the genitals and the anus would be painful. I think cutting through the muscles and fat of the back and separating the buttocks would be painful."
(R. 697-98.)
Many of the issues which Simmons raises on appeal were not presented to the trial court. The failure to raise these claims at trial, however, does not prevent our review of these issues because Simmons was sentenced to death. Any claim of prejudice with regard to these claims does weigh against Simmons, because they were not raised to the trial court. See Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Cr. App.1998), rev'd on other grounds, [Ms. 1980810, January 28, 2000][*]; Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Moreover, Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Finally, we recognize, as we stated in Dunaway v. State, 746 So.2d 1021, 1027 (Ala.Cr.App.1998), aff'd, 746 So.2d 1042 (Ala.1999):
"`This plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."` United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting [in turn] United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982))."

I.
On remand, the trial court conducted a hearing to determine the admissibility of the DNA population frequency statistical evidence. Larry Huys, a forensic serologist for the Birmingham laboratory of the Alabama Department of Forensic Sciences, testified that the Department developed a database from the general population of the State of Alabama, consisting of samples *1150 for 100 Caucasians and 100 African-Americans. This Alabama database is then compared to other databases from around the country to determine that the characteristics commonly noticed in the Alabama database also occurred frequently in other population databases. According to Huys, the characteristics noticed in the Alabama population are similar to characteristics found in other states' populations. Huys testified that his department had been using this procedure for approximately 10 years. Additionally, the Alabama database has been examined by an independent expert, who found no errors in the database or methodology. Huys testified that the statistical methods he used to calculate the DNA match were recommended by the National Research Council and were generally accepted in the scientific community. Moreover, Huys stated that before the results of a statistical analysis of DNA evidence could be published in a report two analysts had to independently obtain the same result. Huys stated that no errors were found in the statistical calculations in this case.
The trial court in its order stated: "I am convinced to a certitude that the DNA population frequency statistical evidence referenced in trial is reliable, relevant, and admissible." (C.R. on remand 25.) We agree. Based on the evidence presented, the trial court did not err in admitting the population frequency statistical evidence. See Williams v. State, 795 So.2d 753 (Ala.Cr.App.1999); Hammonds v. State, 777 So.2d 750 (Ala.Cr.App.1999); and Maples v. State, 758 So.2d 1 (Ala.Cr. App.), aff'd, 758 So.2d 81 (Ala.1999). Because the trial court had before it scientific evidence regarding the reliability and relevance of the population frequency statistic evidence, it did not err in allowing that evidence to be submitted to the jury for its consideration.
No error occurred in the admission of the DNA evidence at trial.

II.
Simmons contends that the trial court erred in admitting into evidence the testimony of Thomas Neer, an agent for the Federal Bureau of Investigation, who worked in their profiling behavioral assessment unit. Neer testified that he had specialized knowledge in crime scene analysis and victimology. According to Neer, his analysis of the crime scene and other evidence of the offense indicated that the offense was sexually motivated and that the person who committed the offense did so for sexual gratification. Simmons argues that the trial court erred in admitting Neer's testimony into evidence because, he says, the evidence was based on scientific analysis and did not meet the Frye standard.
Initially, we find it imperative to note that the evidence offered through Neer's testimony was not "profile" testimony. "Profile" evidence attempts to link the general characteristics of serial murderers to specific characteristics of the defendant. Such evidence is of little probative value and extremely prejudicial to the defendant since he is, in a sense, being accused by a witness who was not present at any of the crimes. See Pennell v. State, 602 A.2d 48, 55 (Del.1991) (holding that FBI agent was properly allowed to testify as expert on serial murders). Neer's testimony did not accuse Simmons of committing the crime. Neer's testimony concentrated on his opinion of what the crime scene and the physical condition of M.A.'s body suggested happened during the murder similar to the testimony of an expert *1151 in the field of accident reconstruction.[2] There is an enormous difference in testimony identifying a person who bears certain characteristics as being more likely to have committed the offense and in testimony that the physical evidence of a crime indicates certain characteristics about the offense.
Simmons's argument is based on a principle articulated in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), which held:
"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in the twilight zone the evidential force of principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."
293 F. at 1014. The Alabama Supreme Court in Ex parte Perry, 586 So.2d 242 (Ala.1991), adopted the Frye test as the standard by which the trial court is to determine whether novel scientific evidence is admissible. Perry, 586 So.2d at 247. See also Turner v. State, 746 So.2d 355 (Ala.1998).
We reject Simmons's argument that Neer's testimony was based on novel scientific evidence. Crime-scene analysis and victimology do not rest on scientific principles like those contemplated in Frye; these fields constitute specialized knowledge. Specialized knowledge offers subjective observations and comparisons based on the expert's training, skill, or experience that may be helpful to the jury in understanding or determining the facts. Crime-scene analysis, which involves the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge. See generally 2 Wigmore, Evidence § 417b at 499 (1979); State v. Russell, 125 Wash.2d 24, 882 P.2d 747 (1994), cert. denied, 514 U.S. 1129, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995); United States v. Meeks, 35 M.J. 64 (C.M.A. 1992); People v. Nolan, 152 Ill.App.3d 260, 105 Ill.Dec. 336, 504 N.E.2d 205 (1987); and Hill v. State, 647 S.W.2d 306 (Tex. App.1982). Therefore, because crimescene analysis is not scientific evidence, we conclude that we are not bound by the test enunciated in Frye. Cf. Ex parte Dolvin, 391 So.2d 677 (Ala.1980) (holding that Frye was inapplicable when evidence is in the nature of physical comparisons as opposed to scientific tests or experiments).
The proper standard to determine whether Neer's testimony is admissible is Rule 702, Ala.R.Evid., which provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
"`[A]ny objection to an expert witness on the ground that he or she lacks knowledge goes to the weight rather than to the admissibility of his or her testimony.'" Holland v. State, 666 So.2d 547, 548 (Ala.Cr.App.1995), quoting Smoot v. State, 520 So.2d 182, 189 (Ala.Cr.App.1987). Whether a witness will be allowed to testify as an expert is largely discretionary and the trial court's decision will not be disturbed "except for palpable abuse." Holland v. State, 666 So.2d at 549, quoting *1152 Sharp v. Argo-Collier Truck Lines Corp., 356 So.2d 147 (Ala.1978).
In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court in a well-reasoned opinion held that Daubert[3] factors may apply to the testimony of experts who are not scientists, but who have specialized knowledge. In Kumho, the United States Supreme Court stated:
"In Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)], this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to `ensure that any and all scientific testimony ... is not only relevant, but reliable.' 509 U.S., at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. The initial question before us is whether this basic gatekeeping obligation applies only to `scientific' testimony or to all expert testimony. We, like the parties, believe that it applies to all expert testimony....
"For one thing, Rule 702 itself says:
"`If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.'
"This language makes no relevant distinction between `scientific' knowledge and `technical' or `other specialized' knowledge. It makes clear that any such knowledge might become the subject of expert testimony. In Daubert, the Court specified that it is the Rule's word `knowledge,' not the words (like `scientific') that modify that word, that `establishes a standard of evidentiary reliability.' 509 U.S., at 589-590, 113 S.Ct. 2786, 125 L.Ed.2d 469. Hence, as a matter of language, the Rule applies its reliability standard to all `scientific,' `technical,' or `other specialized' matters within its scope. We concede that the Court in Daubert referred only to `scientific' knowledge. But as the Court there said, it referred to `scientific' testimony `because that [wa]s the nature of the expertise' at issue. Id., at 590, n. 8, 113 S.Ct. 2786.
"Neither is the evidentiary rationale that underlay the Court's basic Daubert `gatekeeping' determination limited to `scientific' knowledge. Daubert pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the `assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.' Id., at 592, 113 S.Ct. 2786 (pointing out that experts may testify to opinions, including those that are not based on firsthand knowledge or observation). The Rules grant that latitude to all experts, not just to `scientific' ones.
"Finally, it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between `scientific' knowledge and `technical' or `other specialized' knowledge. There is no clear line that divides the one from the others. Disciplines such as engineering rest upon scientific knowledge. Pure scientific theory itself may depend for its development upon observation and properly engineered *1153 machinery. And conceptual efforts to distinguish the two are unlikely to produce clear legal lines capable of application in particular cases....
"Neither is there a convincing need to make such distinctions. Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called `general truths derived from... specialized experience.' Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L.Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest `upon an experience confessedly foreign in kind to [the jury's] own.' Ibid. The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.
"We conclude that Daubert's general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, `establishes a standard of evidentiary reliability.' 509 U.S., at 590, 113 S.Ct. 2786. It `requires a valid ... connection to the pertinent inquiry as a precondition to admissibility.' Id., at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, ..., the trial judge must determine whether the testimony has `a reliable basis in the knowledge and experience of [the relevant] discipline.'" 509 U.S., at 592, 113 S.Ct. 2786.
". . . .
"The petitioners ask more specifically whether a trial judge determining the `admissibility of an [specialized knowledge] expert's testimony' may consider several more specific factors that Daubert said might `bear on' a judge's gatekeeping determination. These factors include:
"Whether a `theory or technique... can be (and has been) tested';
"Whether it `has been subjected to peer review and publication';
"Whether, in respect to a particular technique, there is a high `known or potential rate of error' and whether there are `standards controlling the technique's operation'; and
"Whether the theory or technique enjoys `general acceptance' within a `relevant scientific community.' 509 U.S., at 592-594, 113 S.Ct. 2786.
"Emphasizing the word `may' in the question, we answer that question yes.
"... Daubert makes clear that the factors it mentions do not constitute a `definitive checklist or test.' Id., at 593, 113 S.Ct. 2786. And Daubert adds that the gatekeeping inquiry must be `"tied to the facts"` of a particular `case.' Id., at 591, 113 S.Ct. 2786 (quoting United States v. Downing, 753 F.2d 1224, 1242 (C.A.3 1985)). We agree ... that `[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' ... Too much depends upon the particular circumstances of the particular case at issue.
". . . .
"... The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in *1154 the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in Daubert, the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert, where they are reasonable measures of the reliability of expert testimony."
526 U.S. at 148-51, 119 S.Ct. at 1174-76.
Alabama Rule of Evidence 702 is identical to the Federal Rule of Evidence 702. Fairness to a party seems to dictate that before evidence based on specialized knowledge can be admitted against a party at trial, the party is entitled to a determination that the specialized knowledge is reliable and that it is relevant to a material issue. Once the trial court determines that the testimony involves a legitimate specialized knowledge, that the witness is an expert in that field, and that the expert testimony would assist the jury, a party's rights are adequately protected by the ability to subject witnesses to cross-examination and to attack the basis and methods used in developing the opinion.
Therefore, with the principles enunciated in Daubert and Kumho in mind, we must determine whether the fields of victimology and crime-scene analysis constitute reliable specialized knowledge; whether Neer is an expert within these fields; and whether the subject matter of his testimony is relevant and assists the trier of fact in this case.
Our review of the record indicates that the trial court carefully evaluated the admissibility of Agent Neer's testimony by conducting a lengthy voir dire. Neer testified that he had been investigating homicide crime scenes for approximately 20 years and that he had extensive experience. According to Neer:
"We [Neer and his peers] review cases that are submitted by state, local, and federal law enforcement agencies, unsolved cases that can be homicides, arson, sexual assault, stalking, matters of work place violence, kidnapping, extortions, product tampering.... Essentially, we review a myriad of criminal cases and provide the requesting law enforcement agencies with different types of assistance. It could be investigative strategy or suggestions; it could be an unknown profile characteristics; it could be behavioral assessment, threat assessment.
". . . .
"Criminal investigative analysis is a process whereby we look at a variety of aspects of investigation. And, ... these are usually cases that are afforded our unit because they are unresolved or unsolved. The criminal investigative process involves looking at a case from the standpoint of what we call victimology, which is look[ing] at the victim, trying to understand many aspects of why this person was a victim, why in this location. We look at the scene itself and draw inferences from the crime scene. We rely on the report of the medical examiner and on photographs of the scene, on any toxicology findings. We usually look at the demographics of the area; we look at maps. So, we consider many different sources before we come up with an assessment."
(R. 41-44.)
During defense counsel's cross-examination of Neer, Neer testified that crimescence *1155 analysis of homicides that appear to be sexually motivated began developing as a specialized field in the late 1970s and that the research has been published within the field and subjected to peer review. Neer established the general acceptance of victimology when he testified that numerous law enforcement agencies relied upon crime-scene analysis and victimology when conducting their investigations. Neer detailed the theories supporting crime sceneanalysis and victimology, the way the theories are applied by others with the same "specialized knowledge," and the way the specialized knowledge was applied in this particular case. He further explained the method in which he conducted his investigation and the factors considered in reaching his determination. We recognize that through interviews, case studies, and research a person may acquire superior knowledge concerning characteristics of an offense. Thus, based on the record before us, adequate evidence was presented to establish the reliability of crime-scene analysis and victimology as fields of specialized knowledge. Cf. United States v. Alzanki, 54 F.3d 994 (1st. Cir.1995), cert. denied, 516 U.S. 1111, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996)(holding that testimony of victimologist was relevant in trial for holding household employee in involuntary servitude).
Our review of the record further indicates that the trial court carefully evaluated Agent Neer's professional qualifications. Neer testified that his principal training and experience related to criminal investigative analysis, including "victimology" and that he had taught training sessions in this field. He further testified that he had investigated hundreds of crimes, including sexually motivated homicides. He stated that he had participated in a research project concerning the rape and murder of the elderly and that the foundation for his opinion in this case rested upon his experiences and understanding of offenders and crime scenes. Therefore, Neer was qualified to testify as an expert in the area of crime-scene analysis and victimology, especially concerning the behavior of offenders who sexually exploit their victims. See Edward J. Imwinkelried, The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony, 15 Cardoza L.Rev. 2271, 2292-93 (stating that the reliability of nonscientific expert testimony increases the more experiences an expert has had and the similarity of those experiences to the expert's testimony). Cf. Perkins v. State, [Ms. CR-93-1931, Nov. 19, 1999] ___ So.2d ___ (Ala.Cr.App.1999)(expert's testimony in trial that the victim's broken bone was consistent with a struggle was properly admitted); Hampton v. State, 621 So.2d 376, 377 (Ala.Cr.App.1993) (expert's testimony in trial of defendant accused of first-degree rape that victim's wounds were "consistent with `forcible compulsion'" was properly admitted); and Moss v. State, 545 So.2d 230, 231 (Ala.Cr.App.1989)(expert's testimony in trial of defendant accused of first-degree rape that victim "had recent intercourse that had been somewhat forceful" was properly admitted).
Moreover, we note that experienced officers are qualified to give their opinion regarding their field of expertise. See, e.g., Reuther v. City of Leeds, 599 So.2d 1246, 1248 (Ala.Cr.App.1992) (officer with experience regarding persons driving under the influence was qualified to testify concerning whether the defendant was intoxicated when he was stopped); Donahoo v. State, 552 So.2d 887, 897 (Ala.Cr.App. 1989) (Alabama Bureau of Investigation agent experienced in the field of narcotics was qualified to testify concerning the age *1156 of marijuana plants); Sanders v. City of Birmingham, 542 So.2d 325, 330 (Ala.Cr.App.1988)(police officers were qualified to testify as to whether defendant was intoxicated); Jackson v. State, 440 So.2d 1181, 1184 (Ala.Cr.App.1983) (police officers were competent to testify concerning whether defendant was intoxicated or under the influence of drugs).
Thus, we conclude that Neer's testimony adequately established that crime-scene analysis and victimology are reliable fields of specialized knowledge and that, based upon his studies and experiences in these fields, he was an expert.
Additionally, we must determine the relevance of the evidence and its ability to assist the jury.
"Trial courts should make the `relevance' assessment by addressing the `fit' between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible."
Turner, 746 So.2d at 361.
In this case Simmons was charged with murder made capital because the murder was committed during first-degree sexual abuse. The state was required to prove that Simmons subjected M.A. to sexual contact by forcible compulsion. § 13A-6-66, Ala.Code 1975. First-degree sexual abuse requires proof that the defendant acted with the intent to gratify his sexual desires or those of the person contacted. Intent to gratify the desire of either party may be inferred by the jury from the act itself. Houston v. State, 565 So.2d 1263 (Ala.Cr.App.1990); see Ex parte Cofer, 440 So.2d 1121 (Ala.1983). Forcible compulsion is defined as "physical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person." § 13A-6-60(8), Ala.Code 1975.
The jury in this case was presented with a homicide trial at which no eyewitnesses testified. M.A.'s body was discovered in a horrifyingly, mutilated condition. The method and motivation for killing an elderly female presented serious questions for the jury to resolve. Whether the offender received sexual gratification while committing the offense was a critical issue of the case, and Neer's testimony was probative on that issue. Inferences had to be drawn from the physical evidence presented at the crime scene. Neer offered observations of the crime scene and the elderly female victim that would assist the jury in evaluating the circumstances surrounding the murder and the reasons for the method employed by the offender. "A homicide and its crime scene, after all, are not matters likely to be within the knowledge of an average [trier of fact]." United States v. deSoto, 885 F.2d 354, 359 (7th Cir. 1989)."
We conclude that, in light of the grotesqueness of the crime scene and the condition of M.A.'s body, the trial court did not err in admitting Neer's testimony because the jury would be greatly assisted by a professional analysis of the crime scene in comparison to other murder cases. It seems to us that expert testimony on this subjectwhich the defense was free to contradictwas reasonably likely *1157 to assist the jury in understanding and in assessing the evidence, in that the matter at issue was highly material, and beyond the realm of "acquired" knowledge normally possessed by lay jurors. As the trial court concluded, "[I]n my judgment he presents a specialized knowledge that the rule talks about that would assist the jury in assessing whether or not the offender whoever the offender ... derived sexual gratification from his actions." (R. 78.) Cf. United States v. Cross, 928 F.2d 1030 (11th Cir.1991), cert. denied, 502 U.S. 985, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991)(holding testimony of expert witness could testify that pictures would be of sexual interest to pedophiles especially when "`contested materials are directed at ... [such] a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest.'"); United States v. Johnson, 735 F.2d 1200, 1202 (9th Cir.1984)(holding that "government agents or similar persons may testify as to the general practices of criminals to establish the defendants' modus operandi"); and United States v. Maher, 645 F.2d 780, 783 (9th Cir.1981)(permitting expert testimony that defendant's actions were consistent with the modus operandi of persons transporting drugs and engaging in countersurveillance).
We are also mindful of the importance of determining the prejudicial value of Neer's testimony. Rule 403, Ala. R.Evid. The mere fact that Neer's testimony supported the state's case against Simmons does not make this evidence unduly prejudicial. Neer did not testify that Simmons was the offender, but instead offered his opinion concerning certain characteristics of the offense from the evidence at the crime scene and from the victim's body. As such, Neer's testimony constituted a superior knowledge in an area that would greatly assist the jury in assimilating the evidence presented. Additionally, the trial court expressly instructed the jury on the role of experts and the weight that could be afforded their testimony, by stating:
"[J]ust because the Court allowed these folks to testify and draw conclusions and share with you, I want you to know that you don't have to automatically believe the testimony of a witness because they are so called experts. In passing on the facts in the case you are not required to accept the conclusions or expressed opinions of the witnesses who testified. You determine for you own self, you see, the weight to be given to the testimonies of the people."
(R. 1095.)
Given the task before the jury, the nature of the crime scene, and the condition of the victim's body, we conclude that the probative value of the evidence outweighed its prejudicial impact.
Simmons further contends that Neer's testimony that the offender received sexual gratification from the acts violated the ultimate-issue rule. See Rule 704, Ala.R.Evid. Here, the ultimate issue to be decided by the jury was whether Simmons killed M.A., and if so, did he murder her during the course of committing first-degree sexual abuse. The factual issue whether, at the time of the offense, Simmons received sexual gratification was for the jury to decide in determining the ultimate issuewhether Simmons committed sexual abuse.
In Lee v. State, 565 So.2d 1155 (Ala.Cr. App.1990), this Court addressed the issue whether the trial court erred in allowing an expert witness to testify that, in her opinion, the victims had been sexually abused. We stated:
"In the instant case, Mrs. Joy's testimony was not tantamount to an opinion on *1158 how the case should be resolved or whether the appellants were guilty. Her testimony established the facts upon which her expert opinion was based. In our opinion, her testimony enlightened the jury in an area beyond the average lay person's knowledge and assisted it in arriving at the truth. She did not express an opinion on appellants' guilt, but stated only that, in her opinion, the children had been sexually abused. The ultimate fact in issue was whether appellants abused the children. While it is true that a witness may not give an opinion concerning the ultimate fact in issue, this is not such a case. We do not view Mrs. Joy's statement that the victims had been sexually abused as testimony relating to the ultimate issue."
565 So.2d at 1156.
In Hampton v. State, 620 So.2d 99 (Ala. Cr.App.1992), this Court held that the trial court did not err in admitting into evidence an examining physician's opinion that the injuries of the rape victim were "consistent with ... [f]orcible intercourse."
In this case, Neer frankly conceded the limitations of his testimony. He unequivocally testified that he was not saying that Simmons committed the murder, only that in his opinion the physical evidence from the crime scene and from M.A.'s body indicated that the offense itself was sexually motivated. Neer did not reach a "diagnosis" of sexual abuse and certainly did not identify the offender; thus, we do not perceive Neer's testimony as testimony on the ultimate issue.
Finally, assuming, arguendo, that the admission into evidence of Neer's testimony was error, its admission, at most, would be harmless. Rule 45, Ala.R.App.P. Neer expressly advised the jury that he was not offering the testimony as proof of Simmons's guilt. Evidence independent of Neer's testimony was presented from which the jury could infer that the offender had committed the murder during the course of committing sexual abuse. Dr. Brissie testified that many of M.A.'s wounds were concentrated in the breast and genital areas. Additionally, there was bruising on M.A.'s left breast area, indicating that the offender had forcible sexual contact with M.A. The jury could easily infer from the offender's acts and his inflicting wounds in the reproductive areas that the offense was sexually motivated and that he received a perverse sexual pleasure.

III.
Simmons maintains that the trial court erred in allowing photographs of the crime scene and of M.A.'s body into evidence. Specifically, he argues that the photographs were inflammatory and irrelevant.
In Gaddy v. State, 698 So.2d 1100 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997), this Court stated:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent.... The admission of such evidence lies within the sound discretion of the trial court.... Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds.... Furthermore, photographs that show the external *1159 wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters.... Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.'"
Gaddy v. State, 698 So.2d at 1148, quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See C. Gamble, McElroy's Alabama Evidence, § 207.01(2)(5th ed.1996).
At trial, Dr. Robert Brissie, the chief coroner and medical examiner of Jefferson County, testified regarding the various wounds to M.A.'s body and the cause of her death. Defense counsel timely objected to the admission of the autopsy photographs (Exhibits 44-83.) The trial court admitted the photographs into evidence. The photographs were relevant because they illustrated the testimony of Dr. Brissie, who explained the extensive injuries suffered by M.A. and the cause of her death. The fact that the photographs might have inflamed the jury was an insufficient ground for their exclusion. Accordingly, the trial court committed no error in admitting the photographs into evidence.
Officer Underwood, an evidence technician, testified concerning the evidence obtained from the scene and Simmons's attempt to clean the crime scene after the murder occurred. Defense counsel timely objected to the admission of photographs of M.A.'s body at the crime scene (Exhibits 15-17.) Although defense counsel did not object at trial, he argues on appeal that the trial court erred in admitting into evidence photographs of the toilet bowl containing pieces of M.A.'s intestines. (Exhibits 29-32.) The trial court admitted all of the crime-scene photographs into evidence, and cautioned the jury that it should not let the photographs improperly influence its emotions. In this case, the crime-scene photographs illustrated the testimony of Officer Underwood concerning the evidence obtained from the scene, and depicted the nature and extent of the wounds suffered by M.A. Thus, the photographs were admissible to illustrate how the crime occurred; they were not unduly prejudicial.
Because Simmons suffered no undue prejudice, we conclude that the trial court did not err in admitting the photographs into evidence.

IV.
Simmons contends that because the state used nine of its peremptory strikes to remove African-Americans from the jury, the state violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Simmons did not raise a Batson objection at trial; therefore, we review these contentions under the plain-error rule. Rule 45A, Ala. R.App. P.
"`"For plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in `purposeful discrimination' in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).'
"`Guthrie v. State, 616 So.2d 913, 914(1992) ...'

"Rieber v. State, 663 So.2d 985, 991 (Ala. Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). See also, Boyd v. State, 715 So.2d 825 (Ala.Cr.App. 1997).
"`This court is bound by the certified record on appeal. The certified *1160 record provides no foundation for considering this issue....
"`In many cases the appellate courts in this state have refused to find plain error grounded on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when no prima facie showing of discrimination appears on the face of the record. Ex parte Watkins, 509 So.2d 1074 (Ala. 1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); Jenkins v. State, 627 So.2d 1034 (Ala.Cr. App.1992), aff'd, 627 So.2d 1054 (Ala. 1993); Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).'

"Dobyne v. State, 672 So.2d 1319, 1327 (Ala.Cr.App.1994)."
Smith v. State, 756 So.2d 892, 915-16 (Ala. Cr.App.1998), aff'd, 756 So.2d 957 (Ala. 2000).
We have conducted a thorough review of the record, and no inference is raised that the state engaged in purposeful racial discrimination in its use of peremptory challenges. Therefore, we find no plain error.

V.
Simmons contends that the trial court erred in permitting the state to introduce testimony concerning a blood sample that was taken from him while he was in custody. Specifically, he argues that his rights against self-incrimination and to be free from unreasonable searches and seizures were violated when the blood sample was taken.
In Schmerber v. State, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the United States Supreme Court held that the taking and analysis of a defendant's blood, while he is in custody and over his objection, does not violate a defendant's Fourth Amendment privilege against unreasonable search and seizures, provided that certain factors are considered. The Court stated that, in addition to establishing that there was probable cause to search a defendant, other factors should be considered, including the extent to which the procedure may threaten the individual's health, the extent of intrusion upon the individual's interests in personal privacy and bodily integrity, and the community's interest in fairly and accurately determining guilt or innocence. Schmerber v. State, 384 U.S. at 766-72, 86 S.Ct. at 1833-36.
First, we must determine whether there was probable cause to draw blood from Simmons. The human body can harbor evidence that a crime has been committed. Jones v. State, 719 So.2d 249, 253 (Ala.Cr.App.1996), aff'd, 719 So.2d 256 (Ala.1998). Although a search warrant was not issued to obtain Simmons's blood sample, it is important to note that "[a] search warrant may be issued to recover evidence which cannot be classified as personal property, but that can establish a link between the subject of the search and the criminal activity." Jones v. State, 719 So.2d at 253. A search warrant may be issued if there is probable cause to believe that the property sought "[c]onstitutes, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or any political subdivision thereof." Rule 3.8(4), Ala.R.Crim.P. While our case differs from one in which a search warrant was obtained, these principles assist us in determining if there was probable cause to believe that the invasion into Simmons's body would produce evidence linking him to the crime.
In this case, Birmingham police detective Vincent Cunningham stated in the affidavit for a search warrant of Simmons's *1161 residence and Simmons's person that several witnesses had told him that they saw Simmons threaten a man with a knife in a bar on the day that M.A. died, and that when M.A. was last seen alive she was with Simmons. After evaluating the affidavit, Judge Alfred Bahakel found probable cause for the search. Simmons was present while the officers searched his apartment. Detective Cunningham testified that while the officers were searching the apartment, he talked with Simmons. According to Detective Cunningham, after the officers completed the search, he took Simmons to police headquarters and arrested him. Simmons's blood sample was drawn later that afternoon. Because there was probable cause to search Simmons's apartment and to arrest Simmons, we conclude that probable cause existed to conduct a blood test. Ample evidence was available to indicate that analysis of Simmons's blood sample would link him to the crime. Probable cause existed to support the invasion of Simmons's body to take the blood sample.
Next, we must consider the extent to which the procedure affected Simmons's health. "[F]or most people [a blood test] procedure involves virtually no risk, trauma, or pain." Schmerber v. State, 384 U.S. at 771, 86 S.Ct. at 1836. Thus, Simmons's health and safety were not threatened.
Additionally, we must consider the extent of intrusion upon the defendant's interests in personal privacy and bodily integrity. In Jones v. State, supra, this Court stated:
"`The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure to obtain evidence for fairly determining guilt.'"
Jones v. State, 719 So.2d at 253, quoting Winston v. Lee, 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662, 669 (1985). In Schmerber, the Supreme Court held that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity. Schmerber, 384 U.S. at 771, 86 S.Ct. at 1836. Thus, the blood test was, at most, a minimal intrusion into Simmons's personal privacy and bodily integrity.
Given that there is no evidence that Simmons's health and safety were affected, and that the procedure did not unduly impose on personal privacy and bodily integrity, the community's interest in fairly and accurately determining the guilt or innocence of Simmons who was suspected of murder outweighed the health and privacy factors outlined in Schmerber.
Furthermore, the withdrawal of blood does not violate the Fifth Amendment privilege against self-incrimination. Schmerber v. State, 384 U.S. at 761, 86 S.Ct. at 1830-31. Thus, Simmons may not assert that his privilege against self-incrimination was violated.
No error occurred in the admission of the evidence concerning Simmons's blood sample.

VI.
Simmons contends that the prosecutor made several improper comments during his closing argument in the guilt phase and penalty phase of his trial.
"In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict." Smith v. State, 698 So.2d 189, *1162 202-03 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted); Bush v. State, 695 So.2d 70, 131 (Al.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Al.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). "Prosecutorial misconduct is subject to a harmless error analysis." Bush v. State, 695 So.2d at 131 (citations omitted); Smith v. State, 698 So.2d at 203 (citations omitted).

A.
Simmons argues that during his rebuttal closing argument in the guilt phase of his trial the prosecutor improperly commented on his failure to testify. (R. 1147-48.)
"`"[A] statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify."'" Windsor v. State, 683 So.2d 1021, 1024 (Ala.1994), [citations omitted], on remand, 683 So.2d 1027 (Ala. Cr.App.1994), aff'd, 683 So.2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997), quoting Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990).
In Brooks v. State, 695 So.2d 176 (Ala.Cr.App.1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997), this Court stated:
"[A] prosecutor has the right to indicate to the jury those parts of the evidence or testimony presented by the State that the defense has failed to contradict; that process is not an infringement of the defendant's Fifth Amendment privilege against self-incrimination. Duncan v. Stynchcombe, 704 F.2d 1213, 1215-16 (11th Cir.1983); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993); Griffin v. State, 393 So.2d 523, 528 (Ala.Cr.App. 1981)."
695 So.2d at 180 (holding that comment by prosecutor in closing argument that defense counsel did not produce evidence of the defendant's innocence was not a comment on the defendant's failure to testify). "`"A prosecutor's statement that the defense has failed to put on evidence as promised by defense counsel is not a comment on the defendant's failure to testify. Thomas v. State, 555 So.2d 320, 320-21 (Ala.Cr.App.1989)."'" Long v. State, 668 So.2d 56, 63 (Ala.Cr.App.1995), quoting Donahoo v. State, 647 So.2d 24, 25-26 (Ala. Cr.App.1994).
In Darden v. Wainwright, supra, the United States Supreme Court stated:
"[I]t `is not enough that the prosecutors' remarks were undesirable or even universally condemned.' Darden v. Wainwright, 699 F.2d [1031] at 1036 [ (1983) ]. The relevant question is whether the prosecutors' comments `so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)."
477 U.S. at 181, 106 S.Ct. at 2471, 91 L.Ed.2d at 157.
*1163 "Alleged prosecutorial misconduct must be viewed `"in the context of the entire trial and in light of any curative instructions...." United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989), cert. denied, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990).'" Grayson v. State, 675 So.2d 516, 524 (Ala.Cr.App.1995) (citation omitted), cert. denied, 519 U.S. 934, 117 S.Ct. 309, 136 L.Ed.2d 225 (1996).
As previously noted, Simmons pleaded not guilty and not guilty by reason of mental disease or defect to the charged offenses. During the defense's cross-examination of witnesses, defense counsel continuously interjected the possibility that Simmons had not committed the offense. Defense counsel also interjected the idea that the offense had to have been committed by someone who was insane. During defense counsel's closing arguments, he stated:
"Ladies and gentlemen, this isif this isn't the most insane homicide I've seen in my 23 years in the courthouse; no case is. I don't care what Neer says and this Dr. Ackerson says. Whoever did that crime was insane; just by the fact of the crime. I mean, I'm not going to go back over it because I'm sure Mr. Cochran is; of what happened to that lady. But, that is a mark of an insane person who has got a mental disease or defect, and didn't know right from wrong, because it is terrible enough to shoot or stab somebody once or twice that is terriblebut to do what happened in this case, that is insanity right there....
"That is an insane man right there.... Anybody that would attempt to put partsbody parts down the commode, that person is crazy, and that person belongs in Taylor Hardin [Secure Medical Facility]. The law says he does, or she does; whoever would do something like that....
". . . .
"All we have to show you, ladies and gentlemen, is clear and convincing evidence that because of the mental disease or defect, he could not control his actions and could not know the difference between right and wrong at the time of the action. There is clear and convincing evidence of that in this case."
(R. 1134-41.)
During the state's rebuttal closing argument at the guilt phase of trial, the following transpired:
"MR. COCHRAN [prosecutor]: You know it's kind of funny; Defendant here wants to have it both ways, doesn't he, because he never really comes out and tells you through his attorney, he's never said
"MR. GOMANY [defense counsel]: Judge?
"THE COURT: Yes, sir.
"MR. GOMANY: Give me one secondI wanted you to know why I was getting upbut we can take it up later but I wanted to make sure it was timely made.
"THE COURT: Okay. We will take it up later.
"MR. COCHRAN: Through his attorneys he is telling you two things: `I didn't do it because I'm putting the state through all their proof. I'm making them prove the crime and link me to the crime with this one in a million DNA. And, if you don't buy that when it is all said and done, okay, all right, I did it but I'm insane'; two things. I mean, that is what he is trying to tell you. He puts on this case through his attorneys, and I have not yet heard either one of them say that he did it."
*1164 (R. 1148-49.) (Emphasis added.) Outside the presence of the jury, the defense made a motion for a mistrial on the grounds that the prosecutor had commented on Simmons's failure to testify. The trial court denied the motion and gave the following curative instruction to the jury:
"Another thing I wanted to mention to you at the outset of Mr. Cochran's comments here, he mentioned that through his lawyers the Defendant has not admitted involvement. Please recall one of my instructions earlier that the Defendant's failure to testify in the case may, in [no way], creates any presumption against him. Mr. Cochran's remarks are not to be considered by you as a comment on the Defendant's failure to testify. It would be highly improper and unjust for you to disregard that statute in question; that is, no inference whatsoever may attach to the Defendant's failure to take the stand. Can you all abide by that important instruction? Anybody have trouble with that? Okay, thank you."
(R. 1175-76.)
Simmons argues that the prosecutor's comment that "because he never really comes out and tells you through his attorney, he's never said" constitutes a comment on his failure to testify. The record, however, indicates that the prosecutor, in his rebuttal argument, was attempting to draw a legitimate inference from the evidence presented and to respond to defense counsel's argument. While the singular statement may appear to be a comment on Simmons's failure to testify, when the statement is viewed in the light of the closing argument of defense counsel and in context of the prosecutor's rebuttal argument, the statement does not constitute reversible error.
Moreover, we believe that the trial court's curative instruction to the jury adequately cured any prejudice. "A reversal may be prevented if the trial court sustains an objection to the improper comment and properly and appropriately instructs the jury as to the impropriety of the remark." Hammonds v. State, 777 So.2d at 765. See also Hannah v. State, 518 So.2d 182, 185 (Ala.Cr.App.1987) ("The trial judge is in the best position to determine whether the prejudicial effects of an improper remark can be eradicated by instructions to the jury, and his determination should be accorded great deference.").
Furthermore, even if the statement may have been understood by the jury as an improper comment on Simmons's failure to testify, any error was harmless in this particular case. In Long v. State, this Court stated:
"`[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations. [United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)] (citations omitted), and ... the proper question for a reviewing court to ask is: "[A]bsent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." Id. at 510-511, 103 S.Ct. at 1981.'"
Long v. State, 668 So.2d at 64, quoting Ex parte Greathouse, 624 So.2d 208, 210 (Ala. 1993).
The state presented overwhelming direct and circumstantial evidence that Simmons committed the offense. Moreover, as evidenced by the statements of defense counsel in closing argument, although the defense challenged whether the state's evidence was sufficient to establish beyond a reasonable doubt that Simmons committed *1165 the offense, their main focus in argument was to convince the jury that if it concluded that Simmons did commit the offense, the proper finding would be not guilty by reason of mental disease or defect. Thus, in light of all the evidence presented in this case and the circumstances surrounding the prosecutor's comment, any error was harmless.

B.
Simmons also challenges on appeal numerous prosecutorial comments made during his trial that he did not object to at trial. "`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d at 489, quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Thus, we must consider whether the prosecutor's comments complained of on appeal constituted plain error. Rule 45A, Ala.R.App.P.

Prosecutorial comments made during the guilt phase.

1.
Simmons argues that the prosecutor improperly commented on the use of expert testimony during closing arguments in the guilt phase of trial. Specifically, he argues that the following statements made by the prosecutor were improper:
1. "Sometimes I almost wish we didn't have experts and nobody was allowed to put them on because I have so much [faith] in the common sense of jurors that sit in this courthouse." (R. 1151-52.);
2. "Dr. Conboy and Dr. Riser both said we are out of our field." (R. 1155.)
During closing arguments, the prosecutor stated the following:
"Now, he has talked to you about experts, and the experts are very important. Sometimes I almost wish we didn't have experts and nobody was allowed to put them on because I have so much [faith] in the common sense of jurors that sit in this courthouseover the years I've developed thatbut we do have experts. And, they come in here and they give you opinions in their area where they have expertise. And you've heard from a bunch of them. Judge Hard listed them for you. So, there are a bunch of expert witnesses in this case. And your common sense tells you that when you listen to an expert witness you use the same type of things to determine whether or not you are going to believe what they say just as you would determine in your ordinary life. It is no different than talking to a co-worker, or with your kids if you are a parent, and you look to their demeanor, you look at their background, you look at what they did in terms of getting ready and their basic knowledge, and then you look at most importantly, does what they say make sense? So, that is what you have to do with the experts in this case."
(R. 1151-52.) (Emphasis added.)
The prosecutor's comment, viewed in context, was simply an attempt to impress upon the jury the importance of using common sense in weighing the testimony of the various expert witnesses. Defense counsel repeatedly emphasized in closing argument the expert testimony presented by both parties at trial and the need for the jurors to use their common sense when reaching their verdict. Thus, the prosecutor's comments were a reply in kind. See Griffin v. State, 790 So.2d 267 (Ala.Cr.App.2000); Wilson v. State, 777 *1166 So.2d 856 (Ala.Cr.App.1999); and Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999).
Moreover, we note that prior to the prosecutor's comments, the trial court instructed the jury as follows:
"Use your common sense. You don't leave that at the house, folks, when you come down here as a juror. Please bring your common everyday horse sense into this jury box as you observe the evidence, as you evaluate [a] witness's testimony, and you give the legal definitions real life and breath, if you will.
". . . .
"But, to go back to these experts, folks, they were allowed to express their opinion testimony about their field of expertise, if you will. But, just because the Court allowed these folks to testify and draw conclusions and share with you, I want you to know that you don't have to automatically believe the testimony of a witness because they are so called experts. In passing on the facts in the case your are not required to accept the conclusions or expressed opinions of the witnesses who testified. You determine for your own self, you see, the weight to be given to the testimonies of the people I have outlined in connection with all of the other evidence material to the issue at hand."
(R. 1089; 1095-96.)
The comment by the prosecutor is essentially a recapitulation of the jury instructions previously given by the trial court. The comment by the prosecutor, analyzed in its entire context, certainly did not result in a denial of due process. Darden, supra. Accordingly, we find no error, plain or otherwise, in this particular comment by the prosecutor.

2.
Simmons challenges the prosecutor's statement that the defense experts admitted their limited qualifications with regard to forensic science. During closing argument, the prosecutor argued that the state's expert witnesses appeared to be more prepared and had better qualifications than the defense expert witnesses. Then, the prosecutor stated:
"On the defense side you had folksI'm goingnot going to say they were bad people, but this was not their area and they both admitted that. Dr. Conboy and Dr. Riser both said, "We are out of our field; we are not forensic specialists; this [is] not what we do." So look at the backgrounds of the experts when you compare them."
(R. 1155.) The comment that an expert for the state is more deserving of belief than an expert for the defense is not an improper comment. Coral v. State, 628 So.2d 954, 986 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Moreover, the prosecutor was clearly commenting on evidence presented at trial. Dr. Thomas J. Conboy and Dr. Emily Riser both testified that they were not forensic psychologists. (R. 862, 892, 932.) Thus, we conclude that the prosecutor's comments do not constitute plain error.

3.
Simmons argues that, during closing arguments, the prosecutor improperly commented on his role as a prosecutor, and his observations concerning society's responsibilities. (R. 1098, 1153, 1170, 1235, 1238.) Simmons claims that the following comment by the prosecutor is improper:
"You know, I think that I could do this for 50 more years and I will continue to *1167 be surprised and find myself at this place in a trial and realize how the person who sits over there in that chair has managed to turn all of this around, to make it about him, as if he were caught up, swept up in some chain of events over which he had no control."
(R. 1098-99.)
"`[A] prosecutor has the right to fairly "`reply in kind'" to statements made by defense counsel in the defense's closing argument.'" Brown v. State, 686 So.2d 385, 396 (Ala.Cr.App.1995), aff'd, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), quoting Davis v. State, 494 So.2d 851 (Ala.Cr.App.1986); Ex parte Musgrove, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (Ala.1994). "[W]ide latitude is usually given regarding replies in kind." Blackmon v. State, 574 So.2d 1037 (Ala.Cr. App.1990) (citations omitted).
The defense argued throughout the trial that Simmons suffered from a severe mental illness resulting from a brain injury and that he was intoxicated during the incident. Thus, when viewing the prosecutor's comment in the context of the whole trial, we conclude that the statement was permissible.

4.
Simmons also claims that he was prejudiced by the prosecutor's comment that the state "didn't bring anyone in here who wasn't a true expert." (R. 1153.)
Before the prosecutor made this comment, defense counsel stated the following in his closing argument:
"Sexual abuse means something sexual; some or physical contact. Now, there was no evidence of that in this case; none. Just because Jack or Tomthe name, Jack Neely and Tom Neeris coming down herehired to come down here from Virginia and testify of some book or some theory that the FBI has, and the FBIwe see a lot of this in the paper, it's kind of scary, some of the things they do and some of their tactics, and I hate to see this jury in Alabama base a verdict of sexual abuse  sexual gratification on some guy that spent two minutes on a phone with a technician, and never talkednever made an effort to interview him, or anybody that knew him in the past about sexual habits; or go through his veteran's records ... he never interviewed Dr. Riser; he never interviewed Conboy; none of these people. He never took the time to do it; people that are familiar with the mind. He just looked at photographs and met with Dr. Brissie, and then they expect you to say that he gratified himself sexually, when a distinguished neurologist, Dr. Riser, who was under court order to come here to examine this person said that it could have been anger that caused this woman the injury that she had. So, you see, you have a reasonable doubt."

(R. 1130-32.) (Emphasis added.)
In rebuttal, the prosecutor stated:
"And, I think when you do that and you compare the State's experts on one hand and the Defense experts on the other, you see a real contrast because the State's experts ha[ve] considerable backgrounds in the area in which they were talking to you. I didn't bring anyone here that wasn't a true expert in their area, and I think that was apparent to you.

". . . .
"Special Agent, Tom Neer, is an expert in his area, his background. He's one of only 12 people in the world that do what he does, and I don't know how he does it; I will be honest with you. But, he *1168 specializes in crimes like this, and seeing these horrible photographs of these homicide scenes, he gets sent these horrible photographs of these homicide scenes, he gets sent by the United States ... to Russia, to countries all over the world to train other people in this very specialized area."
(R. 1153-54.)
The comment by the prosecutor, taken in context, is a permissible reply in kind to the defense arguments attacking the credibility of the state's witnesses. "Prosecutors may also argue legitimate replies to arguments put forward by the defense." Slaton v. State, 680 So.2d 879, 892 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). Further, we note that evidence was presented during Simmons's trial as to the expertise and credibility of the state's witnesses. The prosecutor's comment that "I didn't bring anyone here that wasn't a true expert in their area" was a legitimate inference from the evidence presented. Slaton, supra; Smith v. State, 588 So.2d 561 (Ala. Cr.App.1991). Accordingly, we find no error, plain or otherwise, as to this particular claim.

5.
Additionally, Simmons claims that the prosecutor engaged in misconduct:
a. By stating that "one thing I've noticed since I've worked in the job I'm in, we have a problem in our community with responsibility" (R. 1170);
b. By improperly commenting on the role of the jury in a capital murder case (R. 1173); and
c. By stating, "I hope that by your verdict in this case you will send a message" (R. 1173).
The record indicates that during argument the prosecutor stated:
"Ladies and gentlemen, this case is in many ways about responsibility. And, one thing I've noticed since I've worked in the job I'm in, we have a problem in our community with responsibility..... Nobody wants to take responsibility anymore.
". . . .
"Now, I'm sorry that he was in a car wreck 30 years ago; I truly am. I've been in a car wreck myself. I wouldn't wish it on anybody. And, I'm sorry he has spent the better part of his life pouring alcohol and drugs into his body and pickled his brain..... And, ladies and gentlemen, that car wreck and his choice to pollute his brain with drugs and alcohol for most of his life had nothing to do with him killing [M.A.] when he butchered her on the floor of that bathroom.
"Mr. Izard talked about deterrents, and we never talk about deterrents anymore, so I'm going to talk about deterrents. I hope that by your verdict in this case you will send a message; that you will send a message of deterrence; that you will tell people that have something in their background ... a car wreck or something, Get over it; that is not going to justify some sort of a heinous crime like this; you are going to be held responsible. You are not going to come up with some trumped up insanity defense and walk from that. We are going to hold you responsible. I hope that this is the message you send."
In Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999), aff'd, 776 So.2d 203 (Ala.2000), this court held the following when reviewing a similar comment made by the prosecution in that case:
"We find that the prosecutor's comment was clearly a general appeal for law *1169 enforcement and justice as a protection to society, and an appeal to the jury to discharge its duties in such a manner as to punish Freeman for the commission of his crimes and to deter others from committing similar offense."
776 So.2d at 186. Here, the prosecutor's comment, viewed in context of his entire argument, was clearly an "acceptable appeal for law enforcement." Smith v. State, 588 So.2d at 572. "`There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty.'" Freeman, 776 So.2d at 186. We find nothing improper about the prosecutor's comments.

Prosecutorial comments made during the penalty phase.

1.
Simmons claims that the prosecutor's comment that "Don and I prosecute drunks who get in a car and can't operate a motor vehicle" was improper. (R. 1235.)
During his argument in the penalty phase, the prosecutor stated:
"[T]hat he was so intoxicated that he could not control his actions is ludicrous; that he was possibly intoxicated to the level that he couldn't help himself or control his impulses, or to conform his conduct to what the law requires is outrageous.

"Don and I prosecute drunks who get in a car and can't operate a motor vehicle. They are impaired to such a level that they can't drive a car. And, the law has requirements about the level of intoxication that a person must meet to render them incapable of driving down the street, the task that most of us perform every day.
"What Clarence Simmons did to [M.A.], in and of itself, illustrates clearly that he was not in legal terms of `a walking drunk.' What he did took time and thought and precision."
(R. 1235-36.) (Emphasis added.) While we seriously question the propriety of the challenged comment, we do not believe that the comment constitutes reversible error. Defense counsel interjected and argued during the guilt and penalty phases of the trial that Simmons was too intoxicated to be held accountable for his actions. When viewing the prosecutor's statement in that context, it is apparent that the prosecutor was merely commenting on Simmons's mental state, and on the prosecutor's experience in determining the level of intoxication that constitutes legal intoxication. The emphasis in the prosecutor's argument appears to be that Simmons's intoxication level at the time of the incident was not so high as to render him incapable of performing a calculated act. Thus, we conclude that the prosecutor's reference to his duty to prosecute drunk drivers when viewed in light of the entire penalty-phase proceeding was at most harmless and does not constitute reversible error. Rule 45A, Ala.R.App.P.

2.
Next, Simmons claims that the prosecutor engaged in misconduct by stating "I cannot conceive of there being anything worse to happen to a human being." (R. 1238.)
"`It is well established that no legal standard exists to judge the prejudicial qualities of alleged improper comments by either party. Such must be scrutinized in light of the issues, parties, and general circumstances of the particular case.'" Smith v. State, 588 So.2d at 572, quoting Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980). See also Thomas v. State, 766 So.2d 860 (Ala.Cr.App. 1998).
*1170 In Smith this Court addressed the propriety of the following statement made by the prosecutor, "`I can truthfully say that this case is one of the most gruesome and terrible [cases] that I have been involved with." 588 So.2d at 572. This Court concluded:
"This comment was based on a legitimate inference drawn from the evidence and did not constitute an impermissible interjection of the prosecutor's personal opinion. The atrocity of this crime was clearly in evidence through the admission of pictures, as well as through the testimony of the witnesses to the scene of the crime and the physician's testimony to the victim's body."
Smith v. State, 588 So.2d at 572.
In this case, it appears the prosecutor was commenting on the gravity and the heinousness of the crime. Applying the rationale established in Smith, supra, we conclude that the prosecutor's comment was clearly a legitimate and permissible inference drawn from the evidence presented at Simmons's trial.

3.
Simmons claims that the prosecutor engaged in misconduct when he stated, "If this isn't a case where the death penalty is appropriate, then you will never see one." (R. 1257.)
"Prosecutors may also argue legitimate replies to arguments put forward by the defense." Slaton v. State, 680 So.2d at 892. During the penalty phase of the trial, defense counsel argued the following:
"But, I would just ask you to find him recommend a sentence of life without parole and not death by electrocution. We ask you to do that because he does have problems in this area. I'm not making it up.
"You heard from the professionals in this trial, and you have seen them, and the crime was bad, but I think that is marks of an insane person."
(R. 1246.)
In his rebuttal argument, the prosecutor stated:
"This is an appropriate case; somebody with the prior conviction of rape; somebody who attacks and butchers a 65-year-old childlike, great-grandmother on the floor of her own bathroom. If this isn't a case where the death penalty is appropriate, then you will never see one, and I ask you to return it; take that to Judge Hard; the death penalty in this case."

(R. 1257.) (Emphasis added.)
In reviewing this comment in its entire context, we conclude that it is clear that the prosecutor was responding to the defense's argument that Simmons was insane and that he should be sentenced to life imprisonment without parole. Moreover, the prosecutor's comment was a reply in kind based on reasonable inferences drawn from the evidence presented at Simmons's trial. See Slaton, supra. Accordingly, we conclude that the prosecutor's comment does not constitute error, plain or otherwise.

VII.
Simmons contends that the trial court's instructions to the jury during the guilt phase and the penalty phase of his trial contained misleading, incorrect, and confusing principles of law. At the conclusion of the trial court's instructions to the jury during both phases of the trial, Simmons's counsel indicated that he was satisfied with the instructions. Because these claims are presented for the first time on direct appeal, we conduct a plain-error review. Rule 45A, Ala.R.App.P.
*1171 Our review of the trial court's instructions to the jury are conducted in light of the following:
"`In reviewing a trial court's instructions, this court has consistently held that a trial court's oral charge to the jury must be viewed in its entiretynot in `bits and pieces.' Parks v. State, 565 So.2d 1265 (Ala.Cr.App.1990); Williams v. State, 538 So.2d 1250 (Ala.Cr.App. 1988)."
Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Cr.App.1998). Moreover, the questioned language must be given a reasonable construction, not one that is unreasonable or strained. Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997), quoting Kuenzel v. State, 577 So.2d at 517. Furthermore, the questioned language must be considered in such a manner as a reasonable juror would evaluate it. Stewart v. State, 601 So.2d 491, 508 (Ala.Cr.App. 1992).

A. The trial court's instruction regarding intoxication.
Simmons maintains that the trial court's charge to the jury concerning intoxication was confusing and "ha[d] the potential to convey to the jurors that if [he was] intoxicated at the time of the offense and that the intoxication was voluntarily produced, the jury may not consider it in mitigation of intent." (Simmons's brief to this Court at p. 48.)
The trial court instructed the jury, in pertinent part, as follows:
"Now, in assessing whether or not the Defendant's actions were intentional, you people may consider the evidence relative to the Defendant's state of sobriety on the occasion. Should you believe from the evidence that the Defendant was so drunk or intoxicated at the time of the crime that he was incapable of formulating a specific intent, then you could not convict of capital murder or murder.
"Let me read to you what the Supreme Court of Alabama says that I should tell you at a time like this. When an offense consists of an act committed with a particular intent, to say that one's specific intent is one of the elements of the crime, drunkenness, [as affecting] the mental state and condition of the accused becomes a proper subject of inquiry by you jurors in assessing intent. [A]lthough drunkenness in a point of law constitutes no excuse of the crime, still when the nature [and] the essence of the crime is made by law to depend upon the peculiar state and condition of the defendant's mind at the time and with reference to the act done, drunkenness as a matter of fact affecting such state and condition of the defendant's mind again is proper subject for consideration and inquiry by you folks. The question in such cases is what is the mental status?
"In the same case, the Court goes on to say that the degree of intoxication necessary to negate specific intent and thus [reduce] the [grade] of the offense must amount to insanity. Mere drunkenness voluntarily produced is never a defense against a criminal charge and can never [palliate] or reduce impossible some mental condition which is the essential element of the criminal act. It goes on to say partial intoxication will not avail to [disprove] with specific intent. Intoxication must be of such character and extent as to render the accused incapable of distinguishing between right and wrong [stupefaction of the reasoning faculty].[4]

*1172 "So, you folks assess the evidence, you see, considering the evidence relating to intoxication or drunkenness of the accused, and consider it in light of whether or not the Defendant was capable of acting intentionally. An intentional act being required, as you know, for a conviction for either capital murder or murder. Drunkenness is no defense against the charge of recklessness. And, in fact, the law says that one who voluntarily intoxicates [himself] or ingests himself with alcohol does act recklessly by operation of law. So, voluntary intoxication is no defense to reckless conduct."
(R. 1185-88.)
The foregoing instruction on intoxication is substantially similar to the instruction cited with approval by our Supreme Court in Ex parte Bankhead, 585 So.2d 112, 120 (Ala.1991). After evaluating the charge in Bankhead, the Supreme Court concluded, "A jury is capable of determining whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state. The trial court's instructions on intoxication were proper under Alabama law." Bankhead, 585 So.2d at 121. Likewise, we conclude that the trial court's instruction in the present case was proper and reject Simmons's argument.

B. The trial court's instruction on the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel."
Simmons contends that the trial court erred when he used the word "conscious" instead of "conscienceless" in its instruction regarding finding the offense committed was "especially heinous, atrocious, or cruel". The trial court instructed the jury as follows:
"Now of the list of aggravating circumstances provided by law, there are two circumstances which you may consider in this case if you are convinced beyond a reasonable doubt based on the evidence that such circumstance exists. Now, the fact that I instruct you on such aggravating circumstance or define this for you does not mean the circumstances have been proven beyond a reasonable doubt. As you know, whether any aggravating circumstance or circumstances about which I define to you have been proven beyond a reasonable doubt based on the evidence in the case is for you people alone to determine.
"But, the aggravating circumstances which you may consider in this case if you find from the evidence have been proven beyond a reasonable doubt would be 1.: That the Defendant, Clarence Simmons, was previously convicted of a felony involving the use of or threat of violence to the person; and 2.: That the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.
"Now, the term `heinous' means extremely wicked or shockingly evil. The term `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with other indifference to even an enjoyment of the suffering of others. What is intended to be in this particular aggravating circumstance are only those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses. For a capital offense to be especially heinous, atrocious, or cruel, it must be a conscious or hideous crime which is unnecessarily torturous to the victim. All capital cases are heinous, atrocious, and cruel to some extent, but not all capital cases are especially heinous, atrocious, or cruel, compared to other capital offenses. You should not find or *1173 consider this aggravating circumstance unless you find that this particular capital offense involved a conscious or hideous crime that was unnecessarily torturous to [M.A.]."

(R. 1262-64.)(Emphasis added.)
Although the record reflects that the trial court instructed the jury that the offense must be "conscious," it appears that use of the word "conscious" may be an error made by the court reporter. Our observation is supported by the fact that Simmons's trial counsel did not object to the instruction and that the trial court's instruction is substantially similar to instructions provided in Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___ (Ala.Cr.App.1999); and in the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried under Act No. 81-178. "This Court may take notice of typographical errors which are `plainly ... self-corrective, clerical mistake[s].' Stewart v. State, 137 Ala. 33, 34 So. 818, 821 (1903)." Kuenzel v. State, 577 So.2d at 523.[5]
However, assuming it was not an error on the part of the court reporter and that the trial court did substitute the term "conscious" instead of "conscienceless," the use of the word "conscious" in that instruction would not constitute reversible error. The law is clear that the proper term is conscienceless, not conscious. Ex parte Kyzer, 399 So.2d 330 (Ala.1981). Considering the instruction in its entirety, we conclude that the jury understood its responsibility in determining whether the offense was especially heinous, atrocious, or cruel. Despite the use of the term "conscious," the trial court clearly instructed the jury on the definition of the words "heinous," "atrocious," and "cruel." The definitions provided by the trial court clearly conveyed the significance of the crime's being conscienceless or pitiless. The trial court defined what it meant by "a conscious or hideous crime" by stating that the offense must be "unnecessarily torturous to the victim." The trial court further instructed the jury that the offense had to contain additional circumstances to set it apart from other offenses for this factor to be found. Thus, viewing the word in light of a reasonable construction of the entire instruction, we conclude that the trial court's instruction provided the jury with adequate guidance and its possible use of an incorrect word does not constitute plain error. Kuenzel v. State, supra.
Finally, any confusion that the term "conscious" may have caused was, at most, harmless. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983). To determine whether the trial court's failure to give a proper instruction was harmless error, we consider "whether beyond reasonable doubt the result would have been the same had the [especially heinous] circumstance been properly defined in the jury instructions." Lawhorn v. State, 581 So.2d 1159, 1177 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). We conclude that there is no doubt that had the jury been instructed properly, it would still have returned a recommendation of death. The facts presented to the jury unquestionably established that this offense was especially heinous, atrocious, or cruel when compared to other capital offenses. M.A.'s last few minutes of life had *1174 to be filled with terror. Simmons's actions indicate a complete indifference to the value of M.A.'s life. While we hesitate to use a harmless error standard with regard to an instruction on an aggravating circumstance, we are convinced that under these circumstances this offense was especially heinous, atrocious, or cruel, and that the trial court's improper use of a word in that instruction was harmless beyond a reasonable doubt.

C. The trial court's instruction concerning mitigating circumstances.
Simmons contends that the trial court's instruction on the jury's determination of whether a mitigating circumstance existed "effectively precluded jurors from considering simply mercy or other favorable impressions of the defendant gleaned from the proceedings in reaching their decision on punishment." (Simmons's brief to this Court at p. 49.)
The trial court instructed the jury as follows:
"If you find beyond a reasonable doubt that an aggravating circumstance about which I have instructed you does exist in the case, you must then proceed to consider and determine the mitigating circumstances. The law of our state provides a list of some of the mitigating circumstances which you may consider, but that list is not a complete list of the mitigating circumstances that you may consider. The list provided in the Code includes the following: That the capital felony was committed while the Defendant was under the influence of extreme mental or emotional disturbance; also, that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct [to] the requirement of law was substantially impaired.
". . . .
"Now, a mitigating circumstance does not have to be included among the matters that we have discussed. In order to be considered in addition to the mitigating circumstances that we have discussed, mitigating circumstances shall include any aspect of a Defendant's character or record, and any of the circumstances of the offense that the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death. A mitigating circumstance considered by you should be based on the evidence you have heard. When the factual existence of offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
(R. 1267-71.)
The trial court's instruction is a correct statement of law. See Rieber v. State, 663 So.2d 985, 995 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995)("The trial court told the jury that it could consider any evidence in mitigation but that mitigating circumstances had to be based on the evidence."). See also Ex parte Wood, 715 So.2d 819 (Ala.1998), cert. denied, 525 U.S. 1042, 119 S.Ct. 594, 142 L.Ed.2d 536 (1998).
Moreover, "[a] jury may not recommend mercy without reason." Williams v. State, 601 So.2d 1062, 1081 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). This Court has held that it was improper to charge a jury that "[i]f you see fit, whether mitigating circumstances exist or not, you may recommend mercy for the defendant. This recommendation is solely in your discretion *1175 and not controlled by any rule of law. You may make such recommendation with or without reason." Morrison v. State, 500 So.2d 36, 43 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). Evidence must be presented to support a finding of mercy as a mitigating circumstance; Simmons's argument is without merit. Cf. Taylor v. State, 666 So.2d 36, 69 (Ala.Cr.App.), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
Furthermore, we note that the trial court's instructions on mitigating circumstances were essentially identical to those set out in the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried under Act No. 81-178. The trial court's use of an accepted pattern jury instruction "weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). See Perkins v. State, supra. Simmons has not demonstrated how the trial court's instruction substantially impaired his rights.

D. The trial court's instruction defining capital murder during a sexual abuse.
Simmons contends that the trial court's use of the term "aggravating component" when defining capital murder during sexual abuse in its guilt-phase instruction "could" have resulted in the jury's considering sexual abuse as an aggravating circumstance during the penalty phase of his trial. According to Simmons, the following instruction constituted reversible error:
"Now, as to the capital offenses charged, the State alleges that the Defendant committed capital murder in either or of both of two different modes; the intentional killing during a robbery; and moreover, an intentional killing during sexual abuse, having subjected [M.A.] to first degree sexual abuse.... And, as I said also, the State Legislature has provided that one commits capital murder if one intentionally kills another during first-degree sexual abuse. So, a killing component in each of the charged offenses for capital murder, plus the aggravating component of first degree robbery or first-degree sexual abuse that elevates this killing to capital murder. As you will hear me say several times, an intentional killing absent the aggravating component would suffice for a conviction for a lesser offense of murder but not for a capital offense charge which requires proof beyond reasonable doubt of two components."
(R. 1179-80.)(Emphasis added.)
Simmons's argument is based totally on speculation and conjecture. We do not believe that the trial court's terminology confused the jurors. During the penalty phase, the prosecution presented evidence of only two aggravating circumstances: that Simmons had a prior conviction for a crime of violence and that the offense was especially heinous, atrocious, or cruel. The trial court specifically instructed the jury as follows:
"Now, of the list of aggravating circumstances provided by law, there are two circumstances which you may consider in this case if you are convinced beyond a reasonable doubt based on the evidence that such circumstance exists....
"But, the aggravating circumstances which you may consider in this case if you find from the evidence have been proven beyond a reasonable doubt would be 1.: That the defendant, Clarence *1176 Simmons, was previously convicted of a felony involving the use of or threat of violence to the person; and 2.: That the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.
". . . .
"You may not consider any aggravating circumstance other than concerning the two I have instructed you about. And, you may not consider an aggravating circumstance unless you are convinced by the evidence beyond a reasonable doubt of the existence of that aggravating circumstance in the case."
(R. 1262-66.)(Emphasis added.) The trial court specifically instructed the jury to consider only two aggravating circumstances. The fact that the capital offense was committed during sexual abuse was not an aggravating circumstance, and the jury was never instructed that it was. The jury was instructed only on the applicable aggravating circumstances. Jurors are presumed to follow the trial court's instructions. Griffin v. State, supra, and Taylor v. State, supra. There is nothing in the record to indicate otherwise. Thus, we find no plain error. Whitehead v. State, 777 So.2d 781 (Ala.Cr.App.1999).

VIII.
Simmons maintains that the trial court erred when it failed to grant his motion to dismiss the indictment. Specifically, he argues that the grand jury indicted him on charges not contained in the complaint.
In Ex parte Russell, 643 So.2d 963, 965 (Ala.1994), the Alabama Supreme Court stated:
"A complaint instituting a criminal prosecution and authorizing an arrest is `superseded' by the subsequent return of an indictment addressed to the same set of operative facts. See Ala.R.Cr.P. 7.6(a). In such cases, a party is `tried on the charge in the indictment and not on the warrant of arrest or its supporting affidavit.' Henry v. State, 57 Ala.App. 383, 388, 328 So.2d 634, 638 (Ala.Cr.App. 1976) (emphasis added). Cf. Wilson v. State, 99 Ala. 194, 195, 13 So. 427, 427 (1893) (an indictment returned in proper form cures defects in an antecedent charging instrument); Toney v. State, 15 Ala.App. 14, 16, 72 So. 508, 509 (1916) (same); cf. also Hansen v. State, 598 So.2d 1, 2 n. 1 (Ala.Cr.App.1991) (an indictment supersedes antecedent indictments); Broadnax v. State, 54 Ala.App. 546, 549, 310 So.2d 265, 268 (Ala.Cr.App. 1975)."
Our review of the record indicates that both the claim and the indictment contained the same set of operative facts. Thus, the trial court did not err in denying the motion to dismiss the indictment.
We note that the fact that Simmons was initially charged with murder, instead of "capital" murder, does not constitute a denial of due process in a grand jury proceeding. In Breckenridge v. State, 628 So.2d 1012, 1016 (Ala.Cr.App.1993), this Court stated:
"The appellant was initially charged with murder when [he] was arrested; however, as the record clearly shows, the grand jury returned a true bill against the appellant for the capital offense of murder ... It is apparent from the face of the indictment that the grand jury had evidence before it to support this indictment. An indictment should be sufficiently specific to identify the accusation or charge in order that the accused not be tried for an offense different from that intended by the grand jury. Gayden v. State, 38 Ala.App. 39, 80 So.2d 495 (1954). Here, the indictment is sufficiently specific to identify the ... capital offense as the crime intended *1177 by the grand jury to be charged."
Because the face of the indictment indicates that the grand jury was presented with sufficient evidence to support a charge of capital murder, Simmons's due process rights were not violated.

IX.
Simmons contends that the trial court erred in denying his motion to suppress evidence seized during a search of his apartment conducted by law enforcement officers pursuant to a warrant. Specifically, he argues that the knife and the bloody clothing and shoes that were listed in the search warrant and that were seized during the search should have been suppressed because these items were not specifically listed in the affidavit that supplied the probable cause to issue the warrant.
Our review of the record reveals that Simmons preserved this issue by raising it in a motion to suppress that the trial court subsequently denied.
Section 15-5-3, Ala.Code 1975, states:
"A search warrant can only be issued on probable cause, supported by an affidavit naming or describing the person and particularly describing the property and the place to be searched."
This Court stated in Money v. State, 717 So.2d 38 (Ala.Cr.App.1997):
"`When reviewing a lower court's decision to issue a search warrant, this Court looks to the totality of the information available to the issuing judge and does not restrict its review to the "four corners" of the affidavit. United States v. Character, 568 F.2d 442 (5th Cir. 1978).'"
717 So.2d at 44, quoting Wamble v. State, 593 So.2d 109, 110 (Ala.Cr.App.1991).
In this case, Detective Vincent Cunningham, the affiant, stated in the affidavit for the search warrant:
"I, Detective Vincent Cunningham, Birmingham Police Department, am investigating the homicide of [M.A.] of 2040 Highland Avenue, South, Apartment 1105, Birmingham, Jefferson County, Alabama. Her body was found on January 3, 1996 at approximately 9:30 p.m. at 2040 Highland Avenue, South, Apartment 1105, Birmingham, Jefferson County, Alabama. Her body had several stab wounds and she had been disemboweled.

"My investigation has revealed that [M.A.] was seen at approximately 2:00 p.m. at South Place Pool Hall during which Simmons pulled a pocketknife. The witness indicated that [M.A.] interceded in the dispute. The witness indicated that approximately 4:00 p.m. [M.A.] and Simmons left the bar together. At approximately 4:30 p.m. a witness indicated that [M.A.] and Simmons entered the apartment complex located at 2040 Highland Avenue, Birmingham, Jefferson County, Alabama.
"During the course of this investigation hair fibers were secured from the victim's body and her bathroom. The victim's body was completely nude. It is believed that the hair samples found on the victim's body and in her bathroom may belong to Clarence Simmons.
"Affiant shows that based on the above and foregoing facts and information, affiant has probable cause to believe that the above described property is concealed upon or within the aforesaid person(s), place or thing, and that the above described property is subject to seizure and makes this affidavit so that a warrant may issue to search the said person(s), place or thing."
*1178 (C. 201-02.)(Emphasis added.) The affidavit also included a handwritten note, which was initialed by the issuing judge, indicating Simmons's address. The affidavit was signed by the issuing judge and by Detective Cunningham. The search warrant authorized any law enforcement officer to search Simmons and his residence for a pocketknife and for any evidence of the crime of murder, including bloody clothing and shoes.
Because the affidavit indicated that M.A. had been stabbed and disemboweled, the judge could clearly infer that the murderer's clothing and shoes would be bloody, and that a knife was used to commit the murder. See Money v. State, supra (stating that this Court will interpret the affidavit supporting the search warrant in a common sense manner). Considering the totality of the information available to the issuing judge, we find that the information contained in the affidavit adequately revealed the items listed in the search warrant. Thus, the trial court did not err in denying the motion to suppress the evidence seized during the execution of the search warrant.
Furthermore, we note that probable cause was established to issue a warrant to search Simmons's apartment. Given that Cunningham stated in the affidavit that a witness had informed him that Simmons was seen with a knife in a bar with M.A. the afternoon before the murder occurred, and that a witness informed him that Simmons was seen walking into M.A.'s apartment complex the afternoon before M.A.'s body was discovered, sufficient probable cause was established to issue a warrant to search Simmons's residence.

X.
Simmons contends that his "conviction and sentence should be reversed due to the unconstitutionality of the death penalty and in particular electrocution as punishment." (Simmons's brief to this Court at p. 54.)
Simmons's argument has been rejected numerous times by this Court.
"There is an abundance of caselaw,... that holds that the death penalty is not per se cruel and unusual punishment. Neither is electrocution, as a means of capital punishment, cruel and unusual punishment, in violation of the Eighth Amendment. Williams v. State, 556 So.2d 737, 741 (Ala.Cr.App.1986), aff'd in part, rev'd in part on other grounds, 556 So.2d 744 (Ala.1987); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, Boykin v. State, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)."
Scott v. State, 728 So.2d 164, 171 (Ala.Cr. App.1997), aff'd, 728 So.2d 172 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999). See also Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997); Stephens v. State, 580 So.2d 11, 26 (Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.1991), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); and Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.1989), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
Simmons offers no novel arguments in support of his contention; therefore, we rely on our previous holdings and reject his contention that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment.

*1179 XI.
Simmons contends that the trial court erred in admitting into evidence the testimony of the state's rebuttal witness, Dr. Kimberly Ackerson, the certified forensics psychologist who performed the court-ordered examination of Simmons to determine Simmons's mental state at the time of the offense. Specifically, Simmons argues that the trial court erred in determining that Dr. Ackerson was an expert. Simmons did not object to the trial court's admitting Dr. Ackerson's testimony; therefore, we conduct a plain-error review. Rule 45A, Ala.R.App.P.
The proper standard to determine the admissibility of Dr. Ackerson's testimony is Rule 702, Ala.R.Evid. The rule states:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Whether to allow a witness to testify as a expert is within the trial court's discretion; a trial court's determination that a particular witness may testify as an expert will not be disturbed on appeal except for palpable abuse. Robinson v. State, 574 So.2d 910 (Ala.Cr.App.1990). We find no abuse in this case.
The state established that Dr. Ackerson was an expert in evaluating whether an individual was competent to stand trial and determining an accused's mental state at the time of the offense. Dr. Ackerson recited before the jury her credentials, including undergraduate study in psychology, post-graduate studies in forensic psychology, internships, additional post-graduate-level education, and subsequent employment experience in the field of forensic psychology. (R. 1009-19.) Additionally, she testified that she was certified as a forensics examiner and that she had conducted approximately 75 examinations to determine individuals' mental state at the time of the offense and their competency to stand trial. Based on the foregoing, we conclude that the trial court did not abuse its discretion in allowing Dr. Ackerson to testify as an expert witness.
Moreover, her testimony assisted the jury because it helped the jury evaluate the testimony presented by the defense concerning Simmons's mental health. Simmons entered a plea of not guilty and not guilty by reason of mental disease or defect. The defense presented testimony that Simmons suffered from mental illness. Dr. Ackerson testified that, based on her evaluation of Simmons and on her interpretation of the medical records submitted by the defense, it was her opinion that Simmons did not suffer from a long-term mental illness and that he was able to understand the consequences of his actions at the time of the offense. Thus, because Simmons's mental state was at issue, Dr. Ackerson's testimony was relevant.
The trial court did not err in admitting into evidence Dr. Ackerson's testimony.[6]

XII.
Simmons contends that he did not receive effective assistance of counsel because:
1. Trial counsel failed to object to the admission of photographic evidence;

*1180 2. Trial counsel failed to challenge the state's peremptory strikes;
3. Trial counsel failed to object to improper prosecutorial comments;
4. Trial counsel failed to object to the trial court's jury instructions;
5. Trial counsel failed to obtain a ruling on the motion to dismiss the indictment;
6. Trial counsel failed to object to the admission of his blood sample;
7. Trial counsel failed to object to the admission of Dr. Ackerson's testimony;
8. Trial counsel failed to move for a judgment of acquittal; and
9. Trial counsel failed to challenge the trial court's findings with regard to the nonexistence of certain mitigating circumstances.[7]
Simmons raises these claims for the first time on appeal. Although Simmons did not present the above allegations of ineffective assistance of counsel to the trial court, this Court is obligated to review his allegations, pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P., and Frazier v. State, 758 So.2d 577 (Ala.Cr. App.), aff'd, 758 So.2d 611 (Ala.Cr.App. 1999).
"In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
"Id. at 687, 104 S.Ct. at 2064.
"`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances."` Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
"When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr. App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr. App.1985).
"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude *1181 that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'"
"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
"And, even if an attorney's performance is determined to be deficient, the [appellant] is not entitled to relief unless it is also established that `there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.' Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
"In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)."
McNair v. State, 706 So.2d 828, 839 (Ala. Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998).
Our review of the record reveals that Simmons's allegations concerning his trial counsel's performance do not rise to the level of plain error. We have addressed all of the underlying substantive claims in this opinion and found them to be without merit. Because Simmons has failed to establish that there was error with regard to the underlying substantive claims, he has failed to establish that his trial counsel was ineffective for not raising these claims. Moreover, several of the claims concern actions by his attorneys that were consistent with sound trial strategy. Simmons has not shown that counsel's performance was deficient and that the result of the proceeding probably would have been different "but for" his counsel's challenged actions. Thus, we find no plain error in trial counsel's performance on the grounds Simmons raises.

XIII.
In a supplemental brief to this Court, Simmons contends that
"the trial court's decision and order were deficient in that there was insufficient consideration and treatment of the findings of Dr. Conboy and Dr. Riser and insufficient consideration and treatment of the fact that Mr. Simmons was, according to testimony, very intoxicated at relevant times in this case. Further, the trial judge did not recognize the existence of the specific mitigating factors offered by the defense in this case, even though, regardless of the weight given them, those factors were proven to exist according to the relevant evidentiary standard."
(Simmons's supplemental brief to this Court at p. 3.)
In the present case, the trial court, as required under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny permitted Simmons *1182 to present any evidence he considered to be mitigating during the penalty phase of his trial. "Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance." Wilson v. State, 777 So.2d at 893. See also Dunaway v. State, supra; Maples v. State, supra; and Roberts v. State, 735 So.2d 1244 (Ala.Cr.App.1998).
In its sentencing order the trial court stated:
"Thomas Conboy, a clinical neuropsychologist testified that the defendant suffered from severe mental disease or defect and was unable to appreciate the nature and quality of his action due to alcohol-related dementia and a head injury occasioned in traffic accident in 1965.
"Emily Riser, a neurologist practicing at [The University of Alabama at Birmingham] stated that the defendant had dementia, caused by chronic alcohol abuse and the auto accident reference above.
". . . .
"At second stage [the penalty phase] no additional testimony was adduced....
"The defense re-introduced all medical reports that had been received in the guilt-phase of the trial."
(Supp.R.28-9.) The order indicates that the trial court did consider, as required by Lockett, the evidence of mitigation with regard to Simmons's mental health presented during the guilt phase and the penalty phase of the trial. Additionally, the trial court was aware of the evidence presented during the guilt phase of trial. Furthermore, the trial court instructed the jury on intoxication; therefore, it was aware of this evidence.
Simmons argues that because the trial court in its order presented the testimony of his two experts succinctly, the trial court's consideration of their testimony was inadequate. We disagree. The trial court's order indicates that it was aware of the conflicting evidence regarding Simmons's mental health and that it considered the evidence presented. Consideration of the mitigating circumstances is all the law requires. Maples v. State, supra.
Moreover, we reject Simmons's contention that "in the absence of clear proof that the jury did not find the existence of the two statutory mitigators proffered by the state, the trial judge should not have been allowed to determine that those mitigators do not exist." (Simmons's supplemental brief to this Court at p. 6.) There is no statutory requirement that the jury make specific findings of aggravating or mitigating circumstances; therefore, Simmons's argument has no merit. Ex parte Clisby, 456 So.2d 105 (Ala.1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985).
In his brief to this Court, Simmons cites Hadley v. State, 575 So.2d 145 (Ala.Cr. App.1990), in support of his argument. In Hadley, this Court concluded that the trial court erred in not finding the existence of the mitigating circumstance that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." § 13A-5-51(6), Ala.Code 1975. In Hadley there was uncontroverted evidence that the defendant was heavily intoxicated at the time of the offense, that he had a very low intelligence, that he suffered from a number of specific psychoses, and that he had engaged in bizarre behavior on the day of the offense. The present case does not present such compelling evidence. Conflicting evidence was presented on Simmons's *1183 mental health and his ability to appreciate the criminality of his conduct. Consequently, the determination of the existence of this mitigating factor was within the discretion of the trial court. Based on the record before us, we cannot conclude that the trial court erred in not finding the existence of this mitigating circumstance.
The trial court did not abuse its discretion in not finding the existence of the mitigating circumstance. Davis v. State, 720 So.2d 1006 (Ala.Cr.App.1998), cert. denied, 525 U.S. 1149, 119 S.Ct. 1049, 143 L.Ed.2d 55 (1999).

XIV.
Finally, in our search of the entire record for any error that may have adversely affected Simmons's substantial rights, pursuant to Rule 45A, Ala.R.App. P., we conclude that Simmons received a fair trial. However, while our review of the record indicates that the trial court's sentence of death was proper, we are compelled by statute to remand this cause because the trial court's written sentencing order is deficient in that the trial court failed to comply with the requirement of § 13A-5-47(d), Ala.Code 1975, that it "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstances offered pursuant to § 13A-5-52." (Emphasis added.) Therefore, we remand this cause to the trial court with directions that that court enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52, and, once again, decide the appropriate punishment by reweighing the aggravating circumstance against the mitigating circumstances. See Borden v. State, 769 So.2d 935 (Ala.Cr.App.1997); Murry v. State, 562 So.2d 1348 (Ala.Cr.App.1988); and Daniels v. State, 534 So.2d 628 (Ala. Cr.App.1985), aff'd, 534 So.2d 656 (Ala. 1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987).
Additionally, Count II of the indictment charged Simmons with murder made capital because it was conducted during a robbery. On that count, the jury convicted Simmons of the lesser-included offense of murder. The trial court did not impose a sentence for this conviction. While the trial court conducted the proceedings on remand to determine the admissibility of the DNA population frequency statistical evidence, it noted that it did not impose sentence for the conviction of murder. The trial court, subsequently, conducted a sentencing hearing and sentenced Simmons to life imprisonment for this conviction. (R. on remand 25.)
The trial court's action sentencing Simmons to life imprisonment for the murder conviction was outside the scope of our remand order and is void for lack of jurisdiction.
"On remand, the issues decided by an appellate court become the law of the case, and the trial court's duty is to comply with the directions given by the reviewing court. Lynch v. State, 587 So.2d 306 (Ala.1991); McGee v. State, 620 So.2d 145 (Ala.Cr.App.1993)."
Ellis v. State, 705 So.2d 843, 847 (Ala.Cr. App.1996). Thus, because the trial court was without jurisdiction to impose sentence for the conviction in Count II, we remand this cause for the trial court to vacate it order imposing the sentence of life imprisonment.
*1184 Finally, the trial court was without jurisdiction to adjudge Simmons guilty of both capital murder for the sexual abuse-murder of the victim as charged in Count III of the indictment, and murder, as a lesser offense to the capital murder charged in Count II of the indictment. These two offenses arose out of the same conduct and Simmons's conviction for murder of the victim under Count II of the indictment constituted a conviction for the same murder for which Simmons was convicted for capital murder under Count III of the indictment.
Section 13A-1-8(b), Ala.Code 1975, provides, in part, as follows:
"When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"(1) One offense is included in the other, as defined in section 13A-1-9...."
Intentional murder, as defined in § 13A-6-2(a)(1), Ala.Code 1975, is an element of the capital offense of murder committed during the commission of first-degree sexual abuse, as defined in § 13A-5-40(a)(8), Ala.Code 1975, and this element must be proven to support a conviction of the capital offense. Section 13A-1-9(a)(1), Ala. Code 1975. Thus, Simmons's right not to be placed in double jeopardy twice for the same offense was violated when he was convicted of both the lesser-included offense of intentional murder under Count II, which alleged the capital offense of murder during a robbery, and of the capital offense of murder during sexual abuse under Count III.
"`The double jeopardy transgression in this case implicates the trial court's jurisdiction to render a judgment.... Where the jury returns guilty verdicts for both a capital offense alleged in one count of the indictment and the lesser included offense of intentional murder of a capital offense alleged in another count of the indictment, and the same murder was an element of the capital offense and the intentional murder conviction, the trial court should enter a judgment on only one of the offenses.'"
Loggins v. State, 771 So.2d 1070 (Ala.Cr. App.1999).
Thus, we remand this cause with directions for the trial court to vacate Simmons's conviction for intentional murder as a lesser-included offense of the capital offense of murder during a robbery, as charged in Count II of the indictment. Frazier v. State, supra; Loggins v. State, supra; Mangione v. State, 740 So.2d 444 (Ala.Cr.App.1998); and Borden v. State, 711 So.2d 498, 503-04 (Ala.Cr.App.1997), aff'd, 711 So.2d 506 (Ala.), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998).
For the foregoing reasons, Simmons's capital murder conviction under Count III of the indictment is due to be and is hereby affirmed. However, we are remanding this case for the trial court to enter findings as to each of the aggravating, statutory mitigating, and nonstatutory mitigating circumstances and to again determine the appropriate punishment for Count III. Simmons's conviction for murder under Count II of the indictment is reversed and his sentence for that conviction is to be set aside. This cause is remanded to the trial court to vacate its judgment and sentence as to Count II and to issue a new sentencing order as to Count III. No evidentiary hearing is required. The rewritten sentencing order of the trial court shall be filed in this court within 42 days from the date of this opinion.
*1185 AFFIRMED AS TO CONVICTION FOR COUNT III; REMANDED WITH DIRECTIONS AS TO SENTENCING FOR COUNT III; AND REVERSED AS TO CONVICTION AND SENTENCE IMPOSED PURSUANT TO COUNT II.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.

On Return to Second Remand
FRY, Judge.
Clarence Leland Simmons was convicted of capital murder and of intentional murder. We remanded to the trial court for that court to vacate Simmons's conviction and sentence for intentional murder because intentional murder was a lesser offense included in the capital offense of murder committed during a robbery, and to issue a sentencing order relating to the capital-murder conviction and containing specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52. See Simmons v. State, 797 So.2d 1134, 1147 (Ala.Cr.App.2000). The trial court has complied with those directions; it vacated Simmons's conviction for intentional murder and submitted an amendment to its original sentencing order on return to remand that satisfies the statutory requirements.
In addition to reviewing Simmons's capital murder conviction for any error, we have, pursuant to Section 13A-5-53, Ala. Code 1975, reviewed the propriety of his sentence of death. We have searched the entire record for any error, regardless of whether it was brought to our attention or to the trial court, that may have adversely affected Simmons's substantial rights. We conclude that no plain error occurred in either the guilt phase or the penalty phase of the proceedings.
The trial court, in its written sentencing order, found Simmons competent to be sentenced. The trial court found the existence of two aggravating circumstances: that Simmons had been convicted in 1977 of a felony involving the use of, or threat of, violence to the person [rape] and that the capital offense was especially heinous, atrocious, or cruel compared to other criminal crimes. In support of his finding that the offense was especially heinous, atrocious, or cruel, the trial court noted the testimony and the photographs indicating that the victim had been disemboweled. Specifically, the order states:
"[V]arious internal organs of the deceased were spread out on the bathroom floor, the toilet stopped up with human intestinal remains, human tissue found in the cuff of [Simmons's] jeans.
"Coroner Brissie stated that due to the placement and nature of the many grievous wounds suffered by [the victim] that it was highly likely that [the victim] felt pain during the killing episode.
"The pre-mortem suffering of the deceased occasioned by the manner in which she was killed prove the existence of the 8th aggravating circumstances beyond a reasonable doubt."
(C.R. on Second Remand 4.) We agree with the trial court that the evidence presented at trial more than adequately established that this capital offense was especially heinous, atrocious, or cruel.
The trial court noted in its sentencing order that it found none of the statutory mitigating circumstances listed in § 13A-5-51, Ala.Code 1975. The trial court found the existence of one nonstatutory mitigating circumstance: that Simmons suffers from neurocognitive deficits associated with dementia.
The trial court determined that the aggravating circumstances outweighed the *1186 mitigating circumstance and that the jury's recommendation of death was appropriate. The findings of the trial court indicate that it carefully weighed the aggravating circumstances and the mitigating circumstance before sentencing Simmons to death. The record supports the trial court's findings.
Thus, because we conclude that there was no plain error in Simmons's capital murder conviction, and because we conclude that the trial court's findings regarding the aggravating circumstances and the mitigating circumstance are supported by the record, we now determine whether death was the proper sentence. Section 13A-5-53(a), Ala.Code 1975. Simmons's sentence of death was not imposed under the influence of passion or prejudice; our independent weighing of the aggravating circumstances and the mitigating circumstance indicate that the sentence of death was appropriate; and the sentence is not excessive or disproportionate to the penalty imposed in similar cases. See Section 13A-5-53(b), Ala.Code 1975; Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995), aff'd, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct., 1558, 137 L.Ed.2d 705 (1997); and Hunt v. State, 659 So.2d 933 (Ala.Cr.App.1994), aff'd, 659 So.2d 960 (Ala.), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995).
We have searched the entire record for any error that may have adversely affected Simmons's substantial rights and found none. Rule 45A, Ala.R.App.P.
Simmons's sentence of death is due to be, and is hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
NOTES
[1] This case was assigned to Judge Fry on February 15, 1999. Although he was not a member of this Court when this case was orally argued, he has reviewed the audiotapes and videotapes of the argument.
[1] Although some of M.A.'s internal organs were found in the plumbing system at Highland Manor, the testimony indicated that most of M.A.'s large intestine and colon were never found.
[*] Note from the reporter of decisions: On July 21, 2000, the Alabama Supreme Court withdrew its January 28, 2000, opinion in Ex parte Burgess and substituted another opinion. See ___ So.2d ___.
[2] See e.g., Holland v. State, 666 So.2d 547 (Ala.Cr.App.1995); Jackson v. State, 636 So.2d 1275 (Ala.Cr.App.1994); and Britton v. State, 631 So.2d 1073 (Ala.Cr.App.1993).
[3] See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[4] See Green v. State, 342 So.2d 419, 421 (Ala. Cr.App.1977).
[5] While we recognize the magnitude of a court reporter's responsibilities when recording a trial proceeding and that human nature dictates that errors will occur, we implore the court reporter to be extremely conscientious and take the necessary precautions to guard against these kind of errors.
[6] Because we conclude that the trial court properly admitted Dr. Ackerson's testimony, we do not address Simmons's argument that the trial court erred in not, sua sponte, entering a judgment of acquittal and in denying his motion for a new trial based on the alleged error in the admission of Dr. Ackerson's testimony.
[7] Simmons raised this claim in a supplemental brief to this Court. The underlying substantive merits of this claim are addressed in Part XIII of this opinion.